**Ronald E. GALELLA, Plaintiff,**

v.

**Jacqueline ONASSIS et al., Defendants,
United States of America, Intervenor.**

**No. 70 Civ. 4348.**

United States District Court,
S. D. New York.

July 5, 1972.

Bennett D. Brown, New York City, for plaintiff; Julien, Glaser, Blitz & Schlesinger, New York City, Alfred S. Julien, Stuart A. Schlesinger, New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant Onassis; Simon H. Rifkind, Martin London, Lewis A. Kaplan, New York City, of counsel.

Whitney North Seymour, Jr., U. S. Atty. for Southern District of New York, for intervenor; Michael D. Hess, A. W. Fargo, III, New York City, of counsel.

COOPER, District Judge.

## OPINION

### I

### PROCEEDINGS OTHER THAN TRIAL

A. *Pleadings and restraining orders*

In the fall of 1970, plaintiff a professional free-lance photographer, instituted an action [1] against defendant Onassis and three agents of the United States

Secret Service (Agents)—Walsh, Kalafatis and Connelly. The verified complaint [2] seeks damages for alleged false arrest and malicious prosecution and damages for, and an injunction against, the interference with his business by the alleged acts [3] of defendant Onassis in resisting his efforts to photograph her, and by the alleged acts of defendant Agents in obstructing these efforts at the contended behest and inducement of defendant Onassis. The damage claims aggregated $1.3 million.[4]

The answer of defendant Onassis was filed March 8, 1971 with a counterclaim seeking compensatory and punitive damages [5] of $1.5 million and injunctive relief, based on claimed violations of her common law, statutory and constitutional rights of privacy and intentional infliction of emotional distress, assault, harassment and malicious prosecution. Reply papers were filed March 25, 1971.

On July 6, 1971 Judge McLean of this Court granted a motion by the United States Government (Government) to intervene. The complaint in intervention, filed October 20, 1971 sought injunctive relief (pursuant to 18 U.S.C. § 3056) against the plaintiff for alleged interference with the protective duties of the United States Secret Service (Secret Service) toward the minor children of defendant Onassis and her late husband, John F. Kennedy, a former President of the United States; on the same day, summary judgment was granted dismissing the case against the Agents on the ground that no triable issue of fact existed as to whether the Agents were acting within the scope of their employment as Government agents and so were

---

1. The action was removed to this Court on October 7, 1970. Jurisdiction is conferred by 28 U.S.C. § 1442(a).

2. The complaint recites that it was verified on July 13, 1970, but this is clouded by a claim alleged therein based on an incident that actually occurred July 22, 1970. (1136–1141, 649)

3. Plaintiff's claim letter (DX 3101) of March 6, 1970 referred to only one occasion on which defendant allegedly in-

terfered with him. Other incidents relied upon by plaintiff at trial occurred before the claim letter was written.
 "DX" refers to defendant's exhibits, "PX" to plaintiff's exhibits and "GX" to Government's exhibits.

4. Proof on plaintiff's damages was deferred until the determination of liability. (1429)

5. The defendant's damage claim was withdrawn at trial.

immune from suit as a matter of law. The dismissal is presently on appeal with extended time afforded at plaintiff's request. On July 7, 1971 the motions of defendant Onassis for summary judgment on both the complaint and her counterclaim were denied.

Assigned to the motion part, we were presented on October 8, 1971 with an application for an order to show cause coupled with a request for a temporary restraining order prepared by McHugh, Heckman, Smith and Leonard, the attorneys for defendant Onassis. The application was based largely upon the tennis incident of October 4, 1971 and the residence episode of October 5, 1971, described *infra*, alleging continued harassment, surveillance and fear. On that day we signed an order providing protection for defendant Onassis and her children.[6] Following a hearing the order was extended upon good cause shown[7] and by consent in an order filed October 28, 1971.

6. Ordered, that the plaintiff show cause . . . on October 13th, 1971, at 10:00 o'clock in forenoon . . . why a preliminary injunction pursuant to FRCP 65 should not issue herein enjoining the plaintiff, RONALD E. GALELLA, his agents, servants, and employees and all persons in active concert and participation with him pending the final hearing and determination of this action, from harassing, alarming, startling, tormenting, touching the persons of the defendant, Jacqueline Onassis or her children, Caroline B. Kennedy and John F. Kennedy, Jr., and from blocking their movements in the public places and thoroughfares, invading their immediate zone of privacy by means of physical movements, gestures or with photographic equipment, and from performing any act reasonably calculated to place the lives and safety of the defendant, Jacqueline Onassis and her said children, in jeopardy.

It appearing to the court that plaintiff is about to commit the acts hereinafter specified and that he will do so unless restrained by order of this court, and that immediate and irreparable injury, loss or damage will result to defendant before notice can be given and the plaintiff or his attorney can be heard in opposition to the granting of a temporary restraining order, in that plaintiff, after the expiration of a Consent Restraining Order previously entered herein, has renewed conduct and activities deliberately calculated to cause immediate and irreparable harm to the mental and physical well being of the defendant, Jacqueline Onassis and of her infant children, . . . and defendant having given security approved by the court in the sum of $10,000, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained; it is further

ORDERED, that plaintiff, . . . his agents, servants, employees and all persons in active concert and participation with him be and they hereby are restrained from harassing, alarming, startling, tormenting, touching the persons of the defendant, . . . or her children, . . . and from blocking their movements in the public places and thoroughfares, invading their immediate zone of privacy by means of physical movements, gestures or with photographic equipment, and from performing any act reasonably calculated to place the lives and safety of the defendant, . . . and her said children, in jeopardy . . .

7. Affidavits verified October 12, 1971 by John F. Kennedy, Jr. and Caroline Kennedy, minor children of defendant, were filed with us. The former alleged: "I feel threatened when he [Galella] is present. I very much wish to avoid him. . . . To date he has not caused any serious physical injury although I am continually conscious of his pursuit and I hate to see him always following me. . . . I think any one would fear someone who follows you every where, and I fear Mr. Galella." (4091–4092) Caroline Kennedy alleged: "Unfortunately, I am one of his favorite targets, and as such have been subjected to numerous unpleasant and often dangerous incidents with him. . . . Unlike the many other photographers Mr. Galella often rushes at me, snaps flash bulbs in my face, trails me closely and uses other techniques that I find dangerous and threatening. I don't feel safe when he is near and will go to great lengths to avoid him. . . . My encounters with Mr. Galella have been frequent and unpleasant. So far I have not suffered serious physical injury, although I am constantly aware of his pursuit. This bothers me and I wish he would stop coming so close. I fear I will be hurt. Ever since we have lived in the White House many photographers have taken

On November 3, 1971 we signed an order to show cause why the plaintiff should not be held in contempt of our October 8, 1971 order. This contempt motion (but not the underlying October 8, 1971 order) was ultimately withdrawn at trial. (766)

On December 2, 1971 the firm of Paul, Weiss, Rifkind, Wharton & Garrison, substituted as counsel for defendant, brought on an order to show cause, coupled with a temporary retraining order, to punish the plaintiff for contempt of the October 8, 1971 order. This order [8] based upon the alleged surveillance of defendant and her children, was signed on December 2, 1971 and provided in essence that plaintiff and his agents cease surveillance and following, remain at least 100 yards from the home and 50 yards from the person of Mrs. Onassis and her children [9] (200 yards and 100

---

pictures of me, almost all of them have been polite to me, but Mr. Galella is different. . . . I was very upset by his actions, and it seems that whenever we go anywhere he is constantly jumping in front of me and thrusts his camera in my face. He is always around. He pushes himself close to me. He makes strange sounds and movements. He never lets me alone. He scares me and I wish he would give my brother and myself a little bit of privacy." (4093–4094)

8. LET THE PLAINTIFF SHOW CAUSE, in the United States District Court, Room 1505, Foley Square, New York, New York, on December 15, 1971 at 10 A.M., or as soon thereafter as counsel can be heard, why an order should not be entered herein pursuant to Civil Rule 14 of the rules of this Court and 18 U.S.C. § 401(3), adjudging the plaintiff in contempt of this Court for having violated and disregarded the terms of said temporary restraining order, ordering that plaintiff purge himself of said contempt by payment to defendant Jacqueline Onassis of the sum of $10,000, together with all the costs of this proceeding, including attorneys fees, and restraining the plaintiff, Ronald E. Galella, his agents, servants, employees and all persons in active concert and participation with him from photographing the defendant, Jacqueline Onassis, or her children, Caroline B. Kennedy and John F. Kennedy, Jr., from keeping the defendant or her children under surveillance or following them, from approaching within a distance of 200 yards of the apartment building at 1040 Fifth Avenue, New York, New York, from knowingly being physically within 100 yards of the persons of defendant Jacqueline Onassis and her infant children, Caroline B. Kennedy and John F. Kennedy, Jr., or any of them, or from communicating or attempting to communicate with any of them in any fashion.

It appearing to the Court that plaintiff is about to commit the acts hereinafter specified and that he will do so unless restrained by order of this Court and that immediate and irreparable injury, loss or damage will result to defendant before notice can be given and the plaintiff or his attorney can be heard in opposition to the granting of a temporary restraining order, in that plaintiff, in spite of the temporary restraining order entered herein on October 8, 1971 and extended by order dated October 28, 1971, has renewed conduct and activities causing immediate and irreparable harm to the mental and physical well being of the defendant, Jacqueline Onassis, and her infant children, Caroline B. Kennedy and John F. Kennedy, Jr., and defendant having previously given security approved by the Court in the sum of $10,000, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained; it is further

ORDERED, that plaintiff, Ronald E. Galella, his agents, servants, employees and all persons in active concert and participation with him be and they hereby are restrained from keeping the defendant or her children under surveillance or following them, from approaching within a distance of 100 yards of the apartment building at 1040 Fifth Avenue, New York, New York, from knowingly being physically within 50 yards of the persons of defendant Jacqueline Onassis and her infant children, Caroline B. Kennedy and John F. Kennedy, Jr., or any of them, or from communicating or attempting to communicate with any of them in any fashion. This order remains in full force and effect until the final resolution of the within application (the parties consenting thereto).

9. We gave the parties opportunity to resettle this order upon adducing proof on the distance requirement: "Now, make no mistake about this, that if that distance differs from the normal distance for taking a picture in the normal way, I am ready to change that order accordingly. . . . If that is excessive, I am ready to change it." Minutes, January 19, 1972, pp. 31–32. No such proof was offered before or during trial.

yards respectively were requested), and that plaintiff be enjoined from communicating or attempting to communicate with them.

On December 10, 1971 the firm of Julien, Glazer, Blitz & Schlesinger entered the action as plaintiff's trial counsel in addition to Bennett Brown, Esq., attorney of record.

A second motion to punish plaintiff for civil contempt was brought on by order to show cause signed March 23, 1972.[10] Plaintiff's sworn answer of March 31, 1972 consists merely of a general denial stating no facts whatever.

During the trial, defendant sought additional injunctive relief for alleged violation of New York Civil Rights Law §§ 50–51, McKinney's Consol.Laws, c. 6, dealing with use of defendant's photograph for advertising purposes.

### B. *Jury demand, consolidation and removal*

■ Despite the very simple legal procedure therefor, no demand for a jury trial was made before the mandatory date, approximately April 4, 1971. On January 25, 1972, over nine (9) months late, plaintiff filed a jury demand. By law we had no alternative but to strike it as worthless. Noonan v. Cunard Steamship Co., 375 F.2d 69 (2d Cir.1967).

By letter of January 25, 1972 we notified the parties that the trial would begin February 14, 1972 (later extended to February 16, 1972 following a request by plaintiff) and suggested consolidation of the proceedings including the preliminary injunction and trial of the main action (which was implemented by order February 3, 1972) consistent with the requests of each party in pretrial memoranda and in the affidavit of plaintiff in support thereof. See Galella affidavit, October 20, 1971, p. 6.

■ On February 2, 1972 we denied a motion to remand for want of jurisdiction in view of the already considerable expenditure of federal judicial time in an action which was properly removed at the time of removal.[11]

10. LET THE PLAINTIFF SHOW CAUSE in the United States District Court, Room 2904, Foley Square, New York, New York, on April 3, 1972, at 10 A.M. or as soon thereafter as counsel can be heard, why an order should not be entered herein

(1) adjudging the plaintiff in civil contempt of this Court, pursuant to Civil Rule 14 of the rules of this Court and 18 U.S.C. § 401, on the grounds that the plaintiff, having had actual notice of the temporary restraining order entered herein on December 2, 1971,

(a) kept defendant Jacqueline Onassis under surveillance in December, 1971 and January, 1972;

(b) either himself or through Nancy Collins––his agent, servant or employee or otherwise a person in active concert or participation with him for that purpose and who had actual notice of said temporary restraining order––was knowingly physically within fifty yards of defendant Onassis on or about January 9, 1972, at or about El Morocco, East 54th Street, New York, New York; and

(c) conspired and agreed with and aided and abetted the said Nancy Collins acting in the aforedescribed capacity to the end that she was knowingly physically within fifty yards of defendant Onassis at the aforementioned time and place;

(2) adjudging the plaintiff in civil contempt of this Court, pursuant to Civil Rule 14 of the rules of this Court, Rule 45, Fed.R.Civ.P., and 18 U.S.C. § 401, on the ground that the plaintiff wilfully failed to produce, pursuant to subpoena and stipulation, the documents marked as defendant's exhibits G and G–1 on the trial of this action although the documents were within his possession, custody or control at all relevant times and were known by him to have been called for by subpoena and stipulation:

(3) ordering that the plaintiff purge himself of said contempts by payment to defendant Jacqueline Onassis of compensatory damages in a sum to be determined by the Court, together with all the costs of this proceeding, including attorneys' fees; and

(4) granting to defendant Jacqueline Onassis such other and further relief as the Court may deem just and proper.

11. Murphy v. Kodz, 351 F.2d 163 (9th Cir. 1965); Hazel Bishop, Inc. v. Perfemme, Inc., 314 F.2d 399 (2d Cir. 1963); Herman Andrae Electrical Co. v. Freiberg,

C. *The failure to file an affidavit or certificate to disqualify the trial judge*

On January 19, 1972 almost a full month before the trial date, Mr. Julien, plaintiff's trial attorney, requested an off-the-record discussion in the robing room. All counsel for the litigants were present (our law clerks as well). Mr. Julien then and there made it perfectly plain that he was contemplating an application to have another judge preside at trial on the ground that having been nominated by President Kennedy, we could not render an unbiased judgment. At the close of that meeting (no other matter was mentioned), we suggested that if such an application were sought, it would be well to bring it on promptly in light of the trial date. Mr. Julien thereupon stated he would confer with his client and if plaintiff decided to move for such relief, an appropriate written application pursuant to law would be made therefor. No such application was ever made.

The statute (28 U.S.C. § 144) provides that such an application can be made only by the filing of "a timely and sufficient affidavit" by the party litigant who seeks to replace the judge. "The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith." Not only did plaintiff fail to meet the deadline for filing, but neither he nor his counsel have ever filed the affidavits which the law makes imperative. Plaintiff deliberately waived any claim of bias.

It ill-behooved Mr. Julien to go around the back way to accomplish what he failed to attempt directly. Nevertheless, several times throughout the trial, he screamed "mistrial, you are biased" at the judge presiding.

## II

## TRIAL

Trial was conducted from February 16 to March 23, 1972. The trial record consists of 4,714 pages, the testimony of 25 witnesses and hundreds of exhibits.[11a]

A. *The credibility of the witnesses*

*Plaintiff's perjury.* Certain testimony was so utterly corrupt that its particular value is to demonstrate plaintiff's willingness to lie. The record is studded with instance after instance where plaintiff's testimony was clearly perjurious. Often his own testimony exposed the perjury and at other times his very testimony compelled its rejection; on occasion he was forced to acknowledge the falsity of his testimony. He sought to subborn perjury by witnesses who had been subpoenaed or have them conceal material matters called for by subpoena.

*Exhibit G.* The importance of the total testimony relating to this exhibit cannot be overrated. It served to demonstrate the quality of plaintiff's trial testimony as well as establish with finality whether he violated the terms of a subpoena which called for the production, *inter alia*, of the following at deposition:

1. All films, photographs, negatives, prints, slides, enlargements and all other photographic products in the possession, custody or control of plaintiff which depict defendant Jacqueline Onassis, Aristotle Onassis, Caroline B. Kennedy, John F. Kennedy, Jr., John Walsh, James Kalafatis, John Connelly and Brian Keller, or any of them, which were taken or made by plaintiff;

2. All films, photographs, negatives, prints, slides, enlargements and

---

332 F.Supp. 858 (E.D.Wis.1971); Fine v. Philip Morris, Inc., 239 F.Supp. 361 (S.D.N.Y.1964).

11a. Final submission of post-trial material was May 8, 1972.

all other photographic products in the possession, custody or control of plaintiff which depict plaintiff and any of the persons listed in paragraph 1 hereof, irrespective of by whom they were taken or made.

The exhibit consists of two identical contact sheets which include photographs taken November 30, 1971 at the Metropolitan Museum of Art. In his affidavit opposing an application to hold him in contempt of our order of October 8, 1971, plaintiff swore: "I had nothing to do with that incident." (600–606)

Initially, plaintiff testified that he had produced all photographs under his control. (558) He then qualified his testimony by asserting he had produced everything except "work that [he] had out at editors for engraving." (567) Shown certain photographs taken by him on November 30, 1971, he admitted that he had not produced all the photographs. (585, 661)

For his failure to produce he offered the explanation under oath that a magazine called "Photoplay" had custody of the photographs. (586) Yet, he testified a little later that he had made one of the two contact sheets constituting exhibit G and had given it to Miss Bernadette Carrozza of the magazine within a day or two after November 30, 1971, that she returned it to him within a week and that he had had custody of it since then. (587–590)

He next reversed his testimony to assert that on February 2, 1972, the magazine had the photographs. (1078–1082) This testimony he promptly re-reversed by admitting that he had exhibit G on that date. (1084–1085)

The two contact sheets brought further revelations. Both had the initials "PP" in red crayon. Plaintiff first testified that the initials were put on each by Miss Carrozza. Feeble though it was, this testimony did give small support to his claim (later abandoned) that he was unable to produce the contact sheets at deposition because they were in Miss Carrozza's hands. He first swore that it was she who put "PP" on DX G, one of the two contact sheets. (672–674) When his attention was called to the fact that the second contact sheet also had "PP" he then swore he had given both to her. (1095) This, of course, contradicted his prior testimony that he had given her only one. (1081) He was then confronted with an obvious fact—there was no need to give her two identical contact sheets, and he admitted he had given her but one. (1098)

Galella was next shown the remarkable similarity of the "PP" on each of the contact sheets. He was forced to state that he had placed the "PP" on one sheet of the exhibit, intending to imitate Miss Carrozza's "PP", so as to trick the Court into believing that Miss Carrozza had had custody of the photograph. (1099–1102, 1105)

After a recess, plaintiff switched his testimony to confess that neither "PP" had been made by Miss Carrozza. (1112–1113) Confronted with his earlier testimony, plaintiff blurted out a word which, in our estimate, sums up his entire recital under oath of this episode—"That's false." (1118)

There is even more. Plaintiff at first denied telling Miss Carrozza to hide exhibit G from the Court. (576) However, after learning that counsel for defense had the facts, he admitted that on February 18, 1972, he had telephoned Miss Carrozza and asked her to hide the photographs. (1087–1088)

It developed that plaintiff had telephoned Miss Carrozza on February 22 (the day he denied under oath telling her to hide the photographs) in his effort to find out whether she had produced copies of the photographs of contact sheet DX G. During that telephone conversation, according to the sworn testimony of Miss Carrozza, plaintiff said to her:

'On the QT the injunction was against me * * * I could get in trouble if they know that I had taken these pictures. I wasn't supposed to be photo-

graphing her then . . . I could go to jail.' (1582)

Galella finally produced exhibit G at trial on February 23, 1972. (664) This was not in the interests of justice. He had been caught.

Among the other irreconcilable inconsistencies between the testimony of plaintiff and Miss Carrozza, we call attention only to the following: She stated he came to her office on February 10, 1972 and asked her to suppress such photographs taken by him as were then in the files of her company. She quoted him as saying:

If you are asked by the Court at any time tell them that you have always assigned me to art of Mrs. Onassis; tell them that every time you have assigned me to the art that you have used. (1556)

The evidence makes it abundantly clear that plaintiff sold "Photoplay" only pictures that "Photoplay" chose to select; that when acting in its behalf, Miss Carrozza never assigned plaintiff to do photographic work. (1568; cf. 572, 3593)

The record of this trial clearly indicates that Galella on at least two other occasions has destroyed photographs made the subjects of contempt applications by Mrs. Onassis.

On October 29, 1971, Mrs. Onassis moved to hold Galella in contempt of the October 8th order, citing events occurring on October 28th. On October 30th, Galella destroyed all of the photographs he had taken on October 28th. (3646–3648) Surely, the most adverse inference possible must be drawn from this conduct.

At his deposition Galella testified that he destroyed or discarded about one-half of the photographs he had taken on December 1, 1971 immediately upon receiving them from the film processor (3242–3243), which was just after Mrs. Onassis had again moved to hold him in contempt, this time relying on the events of December 1st. Again, this destruc-tion of potential evidence gives rise to the most negative sort of inference.

After referring us to a passage in McCormick on Evidence, counsel for defendant summed up the essentials of the trial record pertaining to exhibit G. Both are apt, proper and fully supported by the record. McCormick's observation:

By resorting to wrongful devices [a party] gives ground for believing that he thinks his case is weak and not to be won by fair means. Accordingly, a party's false statement about the matter in litigation . . ., his fabrication of false documents, his undue pressure by bribery or intimidation or other means to influence a witness to testify for him, or to avoid testifying, his destruction of relevant documents, his attempt to corrupt the jury, his transferring or hiding property in anticipation of judgment, all of these are instances of this type of admission by conduct. C. McCormick, Evidence 537 (1954).

And now counsel's summation:

The remarkable thing is that Galella in just this one case, managed to accomplish virtually every kind of underhanded conduct that McCormick gleaned from the entire history of the common law. Galella made false statements about this litigation––indeed, he admitted perjuring himself. He admitted the fabrication of false documents, viz., the forged initials "PP" on Exhibits G and G–2. He tried to persuade Bernadette Carrozza to testify falsely on his behalf and to hide photographs. . . . Indeed, out of McCormick's entire list of types of misbehavior, Galella failed only to tamper with the jury and to hide property in anticipation of judgment —in this non-jury case in which no damages are sought.

Other instances. In our supplemental findings of fact we have collated other instances of Galella's perjury in his testimony concerning Henry Fenton, Joyce

Smith, other assistants, the chase in Central Park, plaintiff's log and the waiter at Capri. Other manifest perjuries appear throughout this opinion and the supplemented findings. Not only was Galella's testimony contradicted by credible witnesses, but time and again he confessed that he had lied and that he had attempted to induce others to corroborate his lies. We still find ourselves amazed at the non-stop character of plaintiff's false testimony.

Blatant perjury for publicity. Plaintiff condemned his complaint and earned its dismissal out of his own mouth. His sworn trial testimony has enormous patches saturated with deliberate falsehood; substantial parts of it demonstrated disdain for the basic concept that without truth there can be no justice. Not a single event, episode or incident, out of scores with which the total trial record deals, was established in his favor. Evidence so bereft of truth cannot uphold any claim for relief whatever. The factual episodes involved on trial were approximately fifty in number; each is considered herein or in our Supplemental Findings; as to none did plaintiff prevail.

Plaintiff was a litigant before us and as such entitled to be heard in full. He stretched it to the breaking point. His trial attorney continually promised more proof in the offing (it never developed) and insisted on being allowed to try his case his way. We allowed that. Plaintiff continued at enormous length to toss around without restraint his baseless "facts." We closely scrutinized his conduct and demeanor on the stand and applied such other criteria as are endorsed by law to spot the emergence of truth. His failure to impress us favorably was complete.

What plaintiff accomplished was infinitely worse than "much ado about nothing." We are convinced his suit had a combined purpose: to induce by harassment the payment of money to him by defendant and/or her husband, and to obtain an advantage that his action would promote——publicity and its resultant financial rewards.

We were simply aghast at trial, and continue to be, at the unlimited effrontery with which plaintiff initiated, attempted to sustain and failed miserably to establish, his spurious assertions. Indeed, brazen is the word for Galella.

*Defendant's testimony.* Qualitatively and quantitatively the total proof adduced on behalf of defendant fully meets the burden of credible testimony by a preponderance of the proof. Applying the tests the law imposes on the fact finder in his constant search to detect truth, we find credible the testimony offered by each witness called by the defense.

The defendant's testimony was of considerable length, it frequently was addressed to minute details and covered many facets of a variety of events. The fact finder had not alone extensive testimony from her (the adverse examination was bitter, repetitious, prolonged and rasping), but full opportunity to observe her conduct on the witness stand as she testified on subjects which were sensitive to a large extent and would naturally evoke a considerable amount of spontaneous reaction. She was candid and careful, frequently searching for the proper word in order to be precise; she was not given to exaggeration.[12]

Add to all this the total exhibits received from both sides, the confessions of plaintiff together with his falsehoods exposed, which in the last analysis unintentionally buttressed defendant's position, (Dyer v. MacDougall, 201 F.2d 265, 269 (2d Cir. 1952)) as well as the corroborative testimony of high order presented by the Government, and the result leaves us with solid segments of proof supportive of her claims.

12. Unlike the large number of inconsistencies between plaintiff's trial testimony and his deposition testimony, the very few pages of defendant's 254 page deposition offered by plaintiff at trial failed to disturb the veracity of her trial testimony.

*Government's evidence.* We found it substantial. The Government witnesses testified convincingly. Agent Keller's straightforward testimony, especially his convincing demonstration of plaintiff's manner of jumping made him one of the most important witnesses called. The Government was corroborated by much proof presented by defendant as well as by the admissions by plaintiff and his demonstrated falsehoods which only served to support the Government's position.

B. *Encounters between the parties occurring before our restraining orders*

Half a dozen episodes suffice to show plaintiff's typical callous behavior prior to our restraining orders.

*Szechuan Restaurant.* Defendant attended a private dinner party at this restaurant in February, 1969. Plaintiff testified he had learned of her presence and secreted himself behind a coat rack in the restaurant. (3754) He had arranged with restaurant personnel to turn up the music loud enough to deaden the sound of his clicking camera. (1897) While stationed at that spot he took at least five or six dozen photographs.[13]

So proud was plaintiff of this accomplishment that he referred to it as his "Mission Impossible"[14] and reenacted it in detail for "Jasmin," a magazine.[15] Defendant testified:

. . . towards the end of the dinner suddenly out from behind something in the front of the room, something dark, Mr. Galella came, and he was moving from side to side, and he was taking pictures to get different parts of our table from different angles, so— —

Q What happened to the dinner party?

A Well, I was mortified for Mr. Pei. (2004)

As to how the event ended, Mrs. Onassis testified:

The dinner party then broke up and everyone tried to get out of the restaurant as quickly as possible. Once we got outside, Galella was . . . leaping around flashing off flashbulbs. We had all been planning to go home together. Everybody separated in the night . . . everyone went home . . . with different people . . . It was a most unsatisfactory ending for an evening, and our host was upset . . . I always try to keep smiling when Galella is there. I know he wants to catch me looking terrified. (2006–2007)

*The bicycle incident.* On September 24, 1969 accompanied by Agent Connelly, defendant and her son went bicycle riding in Central Park. They rode out of the park at about 5:30 p. m. by way of a path with John Kennedy in the lead, his mother next, then Mr. Connelly. Galella jumped out from an area of bushes right onto the middle of the path approximately 10 to 15 feet in front of John, who was compelled to swerve violently to the right to avoid hitting plaintiff; this sudden movement almost caused him to fall off his bicycle. This episode was testified to in detail by defendant (2059–2063), Agents Connelly, Walsh and Kalafatis (4118–4125, 4131–4132, 4044–4049, 4225–4227) and supported by a report of Agent Kalafatis dated September 25, 1969. (4497)

Plaintiff vigorously denied jumping onto the bicycle path. He insisted he had taken his photographs standing approximately 10 feet south of the southern railing along the Central Park bicycle path.[16] (358, 370–371, 885 and the first six frames on contact sheet PX 27) His testimony wavered as to just where he actually stood. (855, 858–859)

Kuhn, an expert witness called by defendant, testified in unequivocal fashion that it was impossible for plaintiff to

13. DX AE–47, 48, 4825, 4417, 4108.

14. Caption, DX AE–GAL 76.

15. DX AE–4825, 4417, 4108 are flash photos.

16. PX 11, 12, 26 and 28.

have been stationed at the spot he claimed when he took the photographs in question. Kuhn had visited the scene and with appropriate equipment tried it out.[17] The results of his experiment and the reasons he assigned for his conclusions were impressive. (4306–4309, 4313, 4315–4318 and exhibits there referred to) Plaintiff agrees with Mr. Kuhn's premises but not his conclusions. (889)

The event took on serious proportions. Special Agent Walsh testified he said to Galella: "Look what you almost did, you almost killed John." (4231) and Mrs. Onassis testified: "He terrorized me that day, and doubly so for the safety of my son." (243)

*Camera strap flicking.* Mrs. Onassis testified to an incident that occurred in September 1970.

> As I came out of 1040, Mr. Galella jumped out at me under the awning. He then—he shouted—not shouted, but he was grunting, and he said, "Glad to see me back, aren't you, Jackie?" And then he took his camera strap and he flicked me on both sides of my shoulders as I was walking to the car. He came so close. Then I got into the car and—and—he was jumping around from side to side all the time in one of the most aggressive ways he has ever come at me. (2022)

*"21" Club—1970.* Accompanied by Mr. Andre Meyer on December 17, 1970 defendant went first to the "21" Club and then to the theatre. As soon as they left her apartment building, they saw plaintiff and some one in a Santa Claus costume whom plaintiff had paid to pose with Mrs. Onassis. (Galella 1869) She testified:

> Santa Claus lunges up at me, pushing, trying to get next to me, pushing Mr. Meyer, scuffling, the doorman is there, too. This strange Santa Claus is running up at us. (2401)

At the same time, she testified, while Galella leaped around her photographing her, he said: " . . . come on, Jackie, be nice to Santa, won't you? Come on, Jackie, snuggle up to Santa." (2401)

Plaintiff and his Santa followed them to "21." Dinner over, they exited the restaurant accompanied by the witness Snyder (a "21" executive) who tried to keep Santa away from defendant, but Santa kept pushing and shoving in his efforts to get next to her and finally succeeded in getting within a few inches.[18] (2402, 4024–4025)

When she reached her car, plaintiff pressed against it with his flash. (Snyder 4026–4027) From "21" they drove to the theatre. Plaintiff followed. He leaped around them in the lobby while they tried to take their seats (2404–2405); he rushed down the aisle twice (she believes) to take photographs of her. (2406, 2410) His behavior compelled her to remain in her seat during intermission. She testified:

> We stayed in our seats 15 minutes. Then everyone in the theatre starts to laugh and point and some, the ones around us and the ones at seats far away are standing up to look over what's happening. Even some of the performers come back on the stage . . . and start looking to see what's happening, and the whole time we're there, this long, long period, where you try—(2411)

After theatre, she returned home. For her the evening was "a wreck."[19] (2418–20)

*"Oliver".* John Kennedy attended Collegiate School and in May, 1971 he appeared in the school's production of "Oliver." Mr. and Mrs. Onassis, Caroline and some friends attended the performance. The public was not invited. Plaintiff had obtained advance information of the event. (1869–1870) He was on the sidewalk outside the school when

17. DX BI and BJ.

18. DX AE GAL 28.

19. Photographs of this incident are identified and discussed at 2402–2418.

defendant and her party arrived. As they proceeded into the building, plaintiff flash photographed them, jumped and leaped about them.[20] (2231)

During intermission when the parents went upstairs to a hall above the school theatre, plaintiff went inside.[21] School personnel ejected him from the building. He then gave his camera to one of the boys attending that school and told him to go in and take photographs of the Onassis party. (2233–2234)

The play over, defendant and her party exited to go to the car. Plaintiff, she testified,

. . . rushed us as we were getting into the car, bumped members of the party, leaped around taking pictures all the time, flashing in the night. . . . (2236)

When they arrived at her apartment building they found plaintiff there.[22] (2247)

Plaintiff conceded he made spot checks at the Collegiate School (1839) including reading the bulletin board notice about "Oliver." (3637) Although he insisted the bulletin board is visible from the lobby, (1849) testimony of witnesses (Andrews 3976, Keller 4542–4543) developed that the bulletin board was at least 15–20 feet inside the 77th Street entrance in a corridor at right angles from it and not visible from that entrance.[23] Mr. Andrews (formerly head master there) also testified to an occasion when he found plaintiff wandering about the school corridor. Plaintiff objected when Andrews asked him to leave; he left after being informed that the police would be called. (3974–3975)

20. DX AE–459.

21. DX AE 216, 230, 232, 241–242, 244–245, 247, 287, 459, 676, 4113, 4115, 4400, 4405, 4409, 4529, 4530, 4531, 4642, 4645 and 4648.

22. See also DX 4112.

23. On a number of other occasions plaintiff has photographed defendant entering and leaving the Collegiate School.

*The tennis courts.* On October 4, 1971, defendant accompanied her daughter Caroline to the Central Park tennis courts to watch her take a tennis lesson.[24] Mrs. Onassis testified:

He rushed up the stairs of the tennis house. He was leaping around inside and he knocked over a trash can.[25] He bumped into Caroline, bumping her against the wall. He caused a great commotion and we were upset. (2253)

While in the tennis house, he yelled, " . . . aren't you glad to see me back, Jackie?" and, "How are you, Caroline?" (2255)

Caroline then went onto the court and while her mother walked to an outside bench from which she could watch, Galella followed her taking photographs of her from 2 or 3 feet away. Then he went outside the fence,

running around, taking pictures of me watching her [and] of her . . . Once he was really close because I could hear him grunting . . . once he was really close behind me. (2253, 2255–2256)

A few minutes later, plaintiff ran to the side of the court and continued taking photographs of Caroline from a position to the side and in front of her, his camera right up against the fence. (Agent Keller 4567–4569, Defendant 2253–2254) A crowd began to gather. Agent Walsh moved close to Galella, and according to defendant,

Agent Walsh said to Galella, 'Can't you see you're making her nervous?' Galella then yelled to Caroline, 'I'm not making you nervous, am I, honey?' And she said, 'Yes, you are.'

(Onassis 2223–2224, DX AE 423, 4226 and 4228)

24. DX AE 482, 486, 493, 495–496, 647, 651–652, 4815 and 4817.

25. Plaintiff testified: "I admit that I accidentally bumped into a trash container in the Parks Department Clubhouse, but it was not due to any 'violent bumping about' as defendant claims." (3511)

She turned towards me and there were tears in her eyes. (Onassis 2254–2255)

Nonetheless, plaintiff continued taking photographs of Caroline while she took her tennis lesson, stopping only when Mrs. Onassis, attempting to divert his attention from Caroline, (3182) ran from the bench. Galella took off after her.

After the chase, plaintiff testified he "went back to get Caroline—to get Caroline playing tennis." (4503) To accomplish this he went through the tennis house and onto the court. A Parks Department employee ran out on the court toward plaintiff yelling, "Get off. You are—you are like a Papparrazo." (Plaintiff 4504, Agent Keller 4579–4580)

Plaintiff ignored the instruction and according to Agent Keller continued photographing Caroline, jumping around in front and to the side of her. Agent Keller ran to the court. Caroline then walked off the court with her instructor, and while doing so Galella backed away taking pictures approximately 3 feet in front of her as she walked in his direction.[26] (4582–4583, 4588, 4590)

When Caroline and Keller got to the tennis house, plaintiff continued taking photographs of her from within two or three feet. Agent Keller requested plaintiff to move away; this instruction Galella also ignored. (Keller 4584) Leaving the tennis house,[27] Caroline and Keller walked in the general direction of her home. As they walked, plaintiff and another photographer assisting him at the time, jumped around them taking photographs within two or three feet of Caroline. For ten minutes both photographers followed Caroline and Keller, taking photographs the entire time. In the course of the walk, Agent Keller testified, Galella addressed: "How do you like the great Papparazzi being back again?" and "Don't be nervous, honey." (4603–4604)

Plaintiff himself took at least 60 photographs of their walk after they left the tennis house. Mr. Keller further testified that as they walked, Caroline turned to him and said, "Why does he always follow us? Why doesn't he leave us alone?" (4625–4627)

*Other episodes.* In addition to these episodes, twenty further episodes are summarized in our supplemental findings of fact. These include instances where the children were caused to bang into glass doors, school parents were bumped, passage was blocked, flashbulbs affected vision, telephoto lenses were used to spy, the children were imperilled in the water, a funeral was disturbed, plaintiff pursued defendant into the lobby of a friend's apartment building, plaintiff trailed defendant through the City hour after hour, plaintiff chased defendant by automobile, plaintiff and his assistants surrounded defendant and orbited while shouting, plaintiff snooped into purchases of stockings and shoes, flashbulbs were suddenly fired on lonely black nights—all accompanied by Galella jumping, shouting and acting wildly. Many of these instances were repeated time after time; all preceded our restraining orders.

He was like a shadow: everywhere she went he followed her and engaged in offensive conduct; nothing was sacred to him whether defendant went to church, funeral services, theatre, school, restaurant, or board a yacht in a foreign land. While plaintiff denied so deporting himself, his admissions clearly spell out his harassment of her and her children.

C. *Episodes occurring after the restraining orders*

Our order dated October 8, 1971 prohibited plaintiff "from harassing, alarming, startling . . . [defendant] or her children . . ., and from blocking their movements . . . invading their immediate zone of privacy

---

26. DX 4803, 4809, 4812–4813 and DX AE 651 frame No. 13–A.

27. DX AE 647, 651 frame No. 26A, 652 frame Nos. 10A, 11A, 12A, 13A, 14A, 16A, 19A and GX 3050.

. . .." This order was in effect during each of the following five episodes.

*Arriving home after dark.* On November 28, 1971, Mrs. Onassis and her children arrived home after dark following a brief holiday. Plaintiff was waiting at the side of the building, hiding from the doorman. Two other photographers (one was his photographer friend, Tom Wargacki) were waiting in a van on the corner of 85th Street and Fifth Avenue.

As defendant and her children were getting out of the car, plaintiff lunged from under the canopy and discharged his flash as the children were alighting. John Kennedy was startled, he fell to his knees, his books scattered in the street. As defendant and her children were walking to the entrance, plaintiff and the other two photographers continued rushing back and forth in front of Mrs. Onassis while taking flash photographs from both the north and south sides of the canopy.[27a] (2460–2469)

*Central Park—December 1, 1971.* On December 1, 1971, plaintiff, with two other photographers, including his friend and helper, Tom Wargacki, planned to badger Mrs. Onassis on her return home from walking her dog in Central Park.

The other two photographers jumped at defendant out of the bushes around the reservoir. Defendant thereupon hurried home, the two in close orbit about her. As she neared home, Galella suddenly came

lunging out from under canopy . . . in a long black leather coat, camera slung around him, . . . within inches of me, . . . taking pictures, leaping, surging around me between there and my entrance to where I live.[27b] (2471–2473)

In the park that day, the two photographers placed themselves so that the maximum number of photographic "shots" would flow from their collective efforts. Galella testified that he found this approach very helpful because it resulted in getting photographs no matter which way defendant turned. (3587)

*Two Gentlemen of Verona.* On the evening of December 1, 1971, defendant and her escort, Michael Forrestal, drove to the Bonwit Teller store where they were to meet Mr. and Mrs. Peter Duchin, their guests for the evening. Defendant remained in the car while Forrestal went into the store to get the Duchins. Galella and his companions appeared and pressed up against the car and took flash photographs of defendant. (2480, 3862, 3917–3918, 4261)

Plaintiff denied he was any where near that store at any time during the day or evening.

After leaving the store, defendant and her party went to the theatre. Arriving early, the defendant and the guests went to the Playbill Bar across the street. From the car to the bar they were subjected to pushing by plaintiff and his three companions as they crossed. (Mrs. Duchin 3920–3921, Mr. Duchin 3864–3866, Forrestal 4262)

When they got to the theatre lobby, plaintiff and his associates were actively engaged taking flash photographs and were "right on top" of the Onassis party, photographing her from a foot or two away, pushing the Duchins on a number of occasions. (3865–3866, 3920)

It was plaintiff's sworn testimony that he was not in the theatre at that time. (3736–3737)

When the Onassis party took their seats just before the start of the show, plaintiff ran down the aisle to photograph defendant. (2481, 3866, 3922, 4262–4263) Here again we have a sworn denial by plaintiff.

During intermission, plaintiff again came down the aisle pushing people out of his way in order to reach and photograph defendant. (3867–3868, 3923, 4263–4264) As the Onassis party proceeded up the aisle, plaintiff photographed them (Mrs. Duchin 3923–3925).

27a. DX AE 682–684, 4740, 4744–4745 and DX G frame No. 9.

27b. Photographs of this incident are identified and discussed at 2476–2478.

This plaintiff admitted. (3839–3842) He pressed so close to Mrs. Duchin and Forrestal as to come within eighteen inches of Mrs. Onassis (3922–3925, 4264) In the lobby they were surrounded by him and his associates. Galella leapt from side to side and knocked people about. (2485)

In an attempt to avoid him, defendant and her friends returned to the bar across the street (2485), and in doing so they were virtually herded by those photographers. Mrs. Duchin testified she was pushed into the path of an oncoming taxicab at a time when defendant was right next to her. (Duchin 3868–3870, Mrs. Duchin 3925–3927, Onassis 2485) Galella pursued the party into the bar. (2485–2486, 3870, 3927–3928, 4265)

Although plaintiff was removed from the bar, he and his co-workers were waiting outside when the Onassis party left there and again they herded them across the street to the theatre, pushing and flashing all the way.[28] (3872, 3929)

The performance over, Galella, bumping and flashing, confronted them again as they proceeded to the car to drive to a restaurant for dinner. (2486, 4265) Plaintiff got into his own car and followed. He was on the sidewalk, running and flashing and getting in front of defendant as she walked from her car into the restaurant. (2486–2487) This was repeated when defendant left the restaurant and entered her car. (2487, 3875, 3930) He again followed them in his car until, at a red light, he desisted only after the chauffeur got out and spoke to him. (Onassis 2487–2488, Duchins 3876–3877, 3931, Forrestal 4266)

We return to plaintiff's testimony: He photographed her that afternoon at 5 p. m. on Fifth Avenue; thereafter he dined at a restaurant, then went to the lobby in the Hotel Croyden at about 6 p. m. where he bought a newspaper and fell asleep there while reading; he awoke about 7:15 p. m., went to the theatre and arrived around 7:30 p. m., a half-hour after the performance started (7:00 p. m.). (3735–3737)

Plaintiff testified there was a witness as to his presence in the lobby—Mr. Ed McGinn, newsboy; (3834) that he had actually talked with him about calling him as a witness, reminding him of the event. (3834–3835) Yet he did not call him. Nor did he call Oscar Abolofia, a photographer friend and associate, (1413, DX GAL 10, 3218) who according to the Duchins was present at both the Bonwit Teller store and the theatre and could have testified to his and to plaintiff's absence if either were the fact. (3862–3867, 3887, 3917–3922) Further, he failed to call Ermina Bruns, an usherette at the theatre that evening, who he claimed gave him permission to enter the theatre in the middle of the first act (this would support his contention that he was not at the theatre before the performance began). During the course of the evening, he took photographs of Miss Bruns which he ultimately presented to her, he said. (3845) He even spoke with her about coming as a witness, and seems to have pleaded with her to testify falsely. (3846–3849)

We accept defendant's version of the facts and conclude that plaintiff's denial of being present before intermission was one of many examples of unrestrained false swearing in which he so frequently engaged. We believe that Galella's brazen behavior that evening was designed to convince defendant that even court orders could not protect her from his onslaughts.

*Christmas service at Collegiate School.* Our further restraining order of December 2, 1971, restrained plaintiff, "his agents . . . and all persons in active concert * * * from keeping the defendant or her children under surveillance or following them, from approaching within a distance of 100 yards of [their home] from knowingly being physically within 50 yards of defendant [or her children] or from communicat-

28. Several photographs of this evening are identified and discussed at 2488–2501.

ing . . . with any of them.
. . . ."

On December 18, 1971, Galella and his hired costumed Santa Claus followed Caroline as she came out to walk her dogs in the park.[29] Agent Keller testified that in the park Galella rushed towards Caroline from behind some bushes; that apparently she became frightened, ran away and Galella chased after her and ahead so as to take photographs of her. Agent Keller told plaintiff to leave Caroline alone, but Galella continued running after her and then dashed ahead so as to get photographs of Caroline entering her apartment building. (4609–4612) Waiting outside the building was Galella's Santa who rushed up to Caroline in an effort to pose beside her for plaintiff's "takes."[30] (4866, 4091)

Later that morning Caroline and her mother left to join John Kennedy in the Collegiate School Christmas service. As they left their building, they were both "accosted" by Santa and Galella. (2427–2428) Mrs. Onassis ran to her car as Agent Kalafatis and the doorman blocked Santa. (2429–2430)

Next, Galella and Santa followed defendant and her daughter, speeding 40–45 miles an hour, weaving in and out trying to pass the Secret Service follow-up car and catch up with the limousine. (4533–4537)

After the church service was over, Mrs. Onassis was prevented by a locked door from going directly into the school. When she reached the street, Galella and Santa lunged at her in the tightly packed crowd. She became separated from her daughter for a moment as Santa and Galella ran around her. (2432)

When Mrs. Onassis and her children left the school, Galella and Santa jumped about them, very close, getting between Caroline and Agent Keller and blocking John and Caroline from entering the limousine. (4545–4546)

Galella followed the limousine to an ice cream store on Broadway. He parked his car outside, photographed Mrs. Onassis and her children eating ice cream inside the store; continued doing so as he followed them walking from the store to the limousine, jumping to the front and side of them and coming as close as three to four feet from them.[31] (2434) Through the car window, he then took photographs of Mrs. Onassis and her children seated in the limousine. (Keller 4562–4563)

As to Galella's part in her day, Mrs. Onassis testified, "I was extremely upset." (2432)

*El Morocco.* There were marked in evidence at the trial color slides of Mrs. Onassis, taken from a distance of 8 or 9 feet on January 9, 1972, when she went to the El Morocco restaurant.[32] (3291) Both restraining orders were then in effect. These slides were among many others which, at the time he gave his deposition, Galella admitted were of photographs taken by him. (3275–3286)

There was sharp conflict between plaintiff's trial testimony on March 15 and the following day. On March 15 he unequivocally insisted that a Nancy Collins had taken the El Morocco photographs. He testified:

. . . [she] offered them to me to sell for her, which I said okay, and we go 50–50 on it if I sell them for her, because she is beginning . . . (3292–3293)

He went on to testify on March 15 that (1) he had not prearranged with Nancy Collins to have those photographs taken, (3299) (2) he was unaware she was going to El Morocco before she went there, (3299) (3) he had not instructed her on how to take those photographs, (3329–3330) (4) he had not given her

---

29. DX AE 4303, 4361, 4381, 4585, 4594 and GAL 1.

30. DX AE 4090–4091, 4866, GAL 1, 6, 16 and photographs described at 2425.

31. DX AE 142–143.

32. DX AE 4756, 4776–4777, 4780 and 4790.

his camera and flash with which to take such photographs (3330–3331) and (5) he did not know who processed those slides or paid therefor. (3342) Thus he sought to show compliance with our restraining orders.

After giving this testimony, Galella learned that the defense had subpoenaed Nancy Collins. (3473) He thereupon went to her apartment that night and discussed with her the El Morocco photographs of January 9, 1972. (3474–3476) When he resumed the stand on March 16, 1972, he admitted the falsity of his entire testimony on the El Morocco photographs given by him the day previous: (1) He had prearranged with Nancy Collins the taking of the Onassis photographs on January 9, 1972. (3504) (2) He himself took Miss Collins to the restaurant area that day for the sole purpose of having her photograph defendant. (3476–3479) (3) He had indeed given Miss Collins instructions on the use of his equipment on January 9, 1972 so that she would be prepared to photograph Mrs. Onassis at El Morocco. (3483–3484) (4) Miss Collins had actually used his camera and flash equipment when the photographs of Mrs. Onassis were taken on January 9, 1972. (3481–3483)

There was also a clear cut reversal of sworn testimony between March 15 and 16 by plaintiff in respect of information he obtained from the doorman at El Morocco. On March 15 he testified he had spoken to a doorman when the restaurant opened in December 1971 but had not offered him money for information about defendant's visits there. (3309–3311) He further testified that he had not received a phone call from anyone at El Morocco as to defendant's expected time of arrival. (3312)

The next day he testified that he had offered money to the doorman at the El Morocco opening in December 1971 for information on defendant's visits there. As to how he learned that defendant was at El Morocco on January 9, 1972, Galella testified that the El Morocco doorman had called him. (3486–3487)

Further testimony by Galella on March 16 revealed he had received similar information from that doorman in December 1971 and had responded by rushing to the restaurant. Plaintiff did not call Nancy Collins to the stand.

We find, from all the facts and circumstances, Galella's testimony as to the El Morocco incident a tissue of lies designed to cover up his violations of the restraining orders. We find that, with Miss Collins close by plaintiff, the El Morocco slides were taken. These same slides were among many others he produced at his deposition pursuant to subpoena and swore were all taken by him.

D. *The requested "PAYOFF"*

Plaintiff admitted mailing to defendant in December 1970 a card bearing the message "Peace on Earth Good Will Toward Men." (DX AJ, AJ–1) One side of the double-faced card depicts plaintiff and a Santa Claus, wearing dark glasses, standing in front of a large Christmas tree; Santa has a fistful of money. The backdrop behind Santa has a photograph of Mrs. Onassis and young John Kennedy crossing Fifth Avenue after the frightening bicycle incident of September 24, 1969.

Also in the backdrop is a heart-shaped photographic cutout pasted on a poster of Olympic Airlines (Mr. Onassis' company) showing Mrs. Onassis and her daughter. In the right hand corner is an easel holding a fairly large sized card reading, "Meet Santa Starring Aristotle Onassis as Santa and Ron Galella as the Paparazzo in THE 'PAYOFF'." To the right is a facsimile of a postage stamp reading, "Ron Galella, New York, New York, Paparazzo."

Both sides of the card are the same except for the position of plaintiff and Santa. On the reverse side, plaintiff is sitting on Santa's lap receiving money from him.

In its totality, the card suggests that plaintiff sought a "PAYOFF" from the Onassis's. The card seems to carry the message that if Mr. Onassis (depicted as Santa in the card) will pay the money

shown in the card to Galella, then Galella will cease his harassment of Mrs. Onassis, typified by the bicycle incident (referred to in the card) and leave John (involved in the bicycle incident) and Caroline (also depicted in the background) in "Peace." "Goodwill" and warm friendship (the heart) are held out.

Mrs. Onassis testified:

The message that this card conveyed to me was that it was blackmail, and Mr. Galella would continue hounding us until my husband paid him money, as in the picture. (2457) [33]

Galella admitted at trial that he had asked Mr. Onassis for a job with Olympic Airlines:

Q Did you say to Mr. Onassis, in words or in substance, that you would stop if he gave you a job for Olympic Airlines?

 (Pause.) . . . .

A I didn't say it that way.

THE COURT: In what way did you say it?

A He was very—

THE COURT: No, what way did you say it.

THE WITNESS: I said how about a job for Olympic Airlines, something like that, you know, suggesting a job like that.

Q And suggesting that you would stop if he gave you a job, right?

A No, no, I didn't say that. I just said that kidding around.

Q Kidding around?

A Yes, He is a very friendly man.

. . .

Q Did you report that conversation to Mr. Friedman?

A I don't recall. (3664–3665)

Galella's breezy dismissal of having sent the card rang hollow. He testified he did not mean blackmail by the card. (3775) He admitted that the card shows Mr. Onassis paying him money. (3783) He stated he did not know that Mrs. Onassis had been frightened by the bicycle incident. (3784) He testified that "PAYOFF" meant "settlement for this case." (3777) By the card he meant to convey "Something original, imaginative." He confessed sending copies of the card to approximately 80 friends and editors. (3772) What did he mean by the card? It "was a joke," he testified. (3773)

We are not impressed with plaintiff's explanation that "PAYOFF" was a hoped-for settlement. We do not regard this suit as having been instituted with a legitimate objective. There is much to indicate that plaintiff sued expecting that the mere threat of publicity——publicity which plaintiff concedes Mrs. Onassis tries to avoid (4357)——would force payment followed by the suit's discontinuance. In fact his attorney of record, Mr. Brown, stated to a public official before this trial commenced:

He is sure that she will settle out of court to avoid any court appearances and adverse publicity. (GX BK, Memo, SA Kalafatis to AD Boggs)

It is significant also that plaintiff's trial counsel tried desperately to have Mrs. Onassis' pre-trial deposition held in a public courtroom—a practice observed only in most exceptional situations (certainly not present here).

In any event, settlements may not be extracted by threats or frightening harassment.

Plaintiff's explanation simply does not wash away (1) the composition of the card itself showing Mr. Onassis giving

---

33. We can well appreciate the indignation of counsel for defense: "Whatever else may be said about this case——about harassment, about freedom of the press, about emotional distress——one thing is clear: no one has a right, constitutional or otherwise, to conduct a coldly calculated and malicious campaign to drive another into paying him off. And that is just what Galella has done here." (Post trial memorandum, p. 210)

plaintiff money with "PAYOFF" in capital letters, (2) plaintiff's knowledge of defendant's desire to avoid him, even by hiding or running away, and (3) his request to Mr. Onassis for a job with Olympic Airlines.

Moreover, our conclusion is reinforced by the testimony of the witness Friedman. Bruce Jay Friedman, author of an "Esquire" magazine article about plaintiff, took the stand and gave his version of his interview with plaintiff on which he based his article. He testified that plaintiff told him

> Mr. Onassis had taken him [Galella] aside and essentially said, why are you doing this? Mrs. Onassis has had a great deal of trouble, and it is not nice. And he said 'It is my job. You have your job and I have mine.' * * * 'I am not a sadist giving her pain. This will help her forget.' (3991, 3995)

Friedman testified that Galella told him that he, Galella, had told Mr. Onassis that he would stop if he were given a job with Olympic Airlines. (3991–3992) Galella admitted he had asked Mr. Onassis for a job with Olympic Airlines, but denied offering to stop in exchange for the job. (3664)

We find that the Christmas card was intended by plaintiff to communicate an offer to cease his harassment of defendant and her children in exchange for money to be paid to him or a job to be given to him by Mr. Onassis. We are unwilling, however, to find that all Galella's behavior prior to sending the card was part of a scheme to extort, intended at the time to culminate in the card.

### E. *The only American paparazzo*

We readily accept the testimony of witness Friedman that Galella described himself as "the world's only American paparazzi".[34] (3998–3999) We emphasize that this trial did not relate to a news photographer, a news reporter or a photo-journalist endeavoring to get a story about a woman and her two children who were, and in our opinion still are, the object of legitimate public interest.

The record establishes at least these differences between the behavior of other photographers and reporters and the attack of the paparazzo:

1. Assaults and batteries. Galella's physical movements were always unnerving and often frightening. Many witnesses testified to his "jumping", "lunging", "leaping", "rushing out", "snaking in and out", "dashing at me", "touching", "bumping", "scuffling", "blocking", "thrusting" his camera and circling (sometimes with assistants) in close orbit about defendant and her children.

Agent Keller made an especially effective witness by his demonstration which followed our request:

> Now, I know what the word 'jump' means. I have heard the testimony over and over again, using that word . . . please step down and show me . . . what you saw Mr. Galella do. (4531)

Agent Keller demonstrated what he had seen Galella do on many occasions. He crouched slightly with hands before him as if holding a camera. He positioned his legs fairly wide apart and bounded, stiff-kneed, in a close semicircle in front of his imaginary subject, his heels pounding heavily against the floor — —more ape than man.

The constance of this Galella practice, applied by him with such unrestrained and relentless vigor, borders on the cruel.

At times the threat of physical harm was heightened, as it appeared that the propeller of his boat might cut defendant's legs or that his wash might capsize John's boat or that John would fall from his bicycle or his horse. At other times there were deliberate or predictable contacts or physical consequences——the "flicking" of his camera strap, "pushing", "brushing", after-images of endless flashbulbs, John falling to his knees

---

34. "Newsweek" magazine defined paparazzo: "annoying bug". (3441)

at night or Caroline falling off her water skis.

2. Offensive mouthings. Unlike other members of the press, Galella "grunts", "yells", makes "strange sounds", "laughs" and calls to defendant: "How do you like me?"; "The Marines have landed!"; "Ha Ha", "Snuggle up to Santa"; "Glad to see me back, aren't you, Jackie?" And to Caroline: "I am not making you nervous, am I, honey?" (he was making her cry); "How do you like the great paparazzi being back again!"

3. Bogus events. Galella forces his subjects into ersatz happenings. He hired a costumed Santa to try to force himself close to defendant so as to create an unreal situation. This false, forced, attempted pose echoes the startled expression which Galella seeks to arouse by his assaults and taunts. News is real; Galella promotes the phony.

4. Self-aggrandizement. Professing anonymity, Galella actually abjured it. His strength was endless in his quest for the limelight. Galella make a career not only of photographing Mrs. Onassis but of being known as one who has done so. The record before this Court shows that he has persistently arranged to have himself photographed with Mrs. Onassis. He has posed for photographs to be published in nationwide and worldwide magazines disclosing the "disguises" he dons to photograph Mrs. Onassis. He boasts openly of the intimate knowledge he has of her every move. He revels in the attention that comes to him as a result of the extreme measures only he is willing to practice.

5. Seeking a "PAYOFF". No self-respecting reporter will suppress his story for a price. Not so Galella, who offered to cease his activities for money or a job.

6. Incessant surveillance. Reporters diligently track their stories down, but when the story is over, they go away. They do not, like Galella, camp for years at their subject's door and dog their every step. The result of Galella's surveillance is that Mrs. Onassi may not enter or leave her home without Galella's knowledge and is faced with the constant threat that he will follow her hour after hour wherever she goes.

7. "Secret Agent" tactics. Outside of movieland, reporters do not normally hide behind restaurant coat racks, sneak into beauty parlors, don "disguises", hide in bushes and theatre boxes, intrude into school buildings and, when ejected, enlist the aid of schoolchildren, bribe doormen and romance maids. The chases that figure in the trial record here would not be performed by a news reporter when there is no news afoot.

\* \* \*

Galella profited by being the only American paparazzo. He had the field to himself; no one else was willing to harass, torment and victimize a subject. He alone was unchecked by inner prohibitions. He alone believes in his right to harass defendant. At trial, when we asked plaintiff's counsel whether a public figure must submit to harassment, there was no response. (4363)

Galella's objective? To establish himself as the peerless photographer who could capture the comings and goings and doings of Mrs. Onassis and her children, and by frightening them, to obtain unusual photographs which bring him handsome returns—financial and otherwise. He made it a world venture. His renown would take him into other fields, other subjects. Personal publicity was the touchstone. The instant suit, we have found, was a publicity stunt coupled with an anticipated settlement—the former objective was achieved; the latter failed.

F. *Effects of Galella on defendant and her children*

Galella's persistent paparazzi attack brought this testimony from defendant:

It caused me anguish. It caused me fear for my safety, for the safety of my children. At times it caused me terror, distress, no peace, no peace of mind, fear for what was going to hap-

pen to them and to me when we would encounter him again; also being under surveyance, [sic] imprisoned in your house, all that deportment over all this time was——caused an enormous strain and unhappiness, and all of that on me, for myself and for my children.[35] (2506)

At other points in her testimony she used such expressions as "terrified" "frightened" "stunned" "startled" "afraid" "anguished" "humiliated". (2088, 2099, 2210, 2502)

> John Kennedy: I feel threatened when he is present. I very much wish to avoid him. I think anyone would fear someone who follows you everywhere . . . (affidavit ¶¶ 2, 6, 4091–4093)

> Caroline Kennedy: Unfortunately, I am one of his favorite targets . . have been subjected to numerous unpleasant and often dangerous incidents with him . . . I don't feel safe when he is near and will go to great lengths to avoid him. He never lets me alone. He scares me. (affidavit ¶¶ 2, 7, 4092–4094)

> Agent Kalafatis: I have seen John and Caroline on several occasions freeze up when they see him . . it really bothers them seeing this man all the time following them wherever they go . . . (4080)

> Agent Connelly: . . . Galella's activities——such as his rushing up to the children and his taking flash photographs of them from close range——have endangered the physical and mental well-being of the Kennedy children. (4217–4217A)

> Agent Ambrose: . . . I feel that his presence near the principals contributes to their feeling abnormally

self-conscious. (report 3–18–71, 4479–4484)

Mrs. Onassis' severe emotional distress is evident and reasonable.

When Galella rushed her limousine at 1040 on September 21, 1969, she was terrified. (2028) Galella's pursuit of her and the children at the horse show in Gladstone, New Jersey, caused her concern and anxiety for fear that his activities would frighten the horse and thereby endanger her children. (2046–2047) Galella's sudden appearance behind bursting flash bulbs at 2 o'clock in the morning at Oliver Smith's house in Brooklyn Heights stunned and startled her. (2099) When Galella crashed about in the tunnel beneath Lincoln Center and tried to push his way through a revolving door with Mrs. Onassis and her children she was frightened that someone would be injured in the door. (2085) Galella's antics in the theatre at *40 Carats* so upset Mrs. Onassis that she covered her face with *Playbill*. (2121) When Galella cruised around Mrs. Onassis in a power boat as she was swimming off Ischia, he was so close that she was afraid she would be cut by the propeller. (2210) Galella's dogging of Mrs. Onassis' footsteps throughout her shopping trip in Capri left her terrified and upset. (287, 2187a, 2203) Galella's taxicab chase with Joyce Smith on October 7, 1971 left Mrs. Onassis a "wreck."

█ When Galella studdenly jumped from behind the wall in Central Park, frightening John and causing him to lose control of his bicycle, Mrs. Onassis described her state of mind as having been "terrorized." (243)[36] The Santa Claus pursuit in and around the Collegiate School in December 1970 left Mrs. Onassis extremely upset. (2432) Galella's outrageous pursuit of Mrs. Onassis on the night of Two Gentlemen of Verona terrified her and left her in an

---

35. She testified: "[her] children only have one parent and a lot of things have happened in their lives." (1987)

36. Plaintiff's counsel argued that Galella's dangerous conduct has never caused any

actual injury to the children; the most that can be said is that there are several occasions when they were "almost" injured. The test for injunctive relief, however, is *threat* of irreparable injury, amply demonstrated on the facts.

"anguished," "humiliated" and "terribly upset" state. (2502–2503) Numerous times, and at dangerous speeds, he has followed cars in which the children were passengers, violating the rules of the road, and the Secret Service agents assigned to protect the children have frequently expressed concern for the safety of their principals as a result of Galella's activities. (4644–4645 [Keller]; 4660–4662 [Walsh]; 4216–4217A [Connelly]; 4078–4080 [Kalafatis]).

Additionally, Mrs. Onassis and her children are people who have a very special fear of startling movements, violent activity, crowds and other hostile behavior. It is clear that the assassinations of the first husband of Mrs. Onassis and of her brother-in-law (Senator Robert F. Kennedy) are matters of common knowledge to virtually every citizen. These matters were certainly known to Galella who "specializes" in the affairs of Mrs. Onassis and who chronicled her brother-in-law's funeral. These events make Mrs. Onassis and her children particularly susceptible to Galella's erratic behavior and make his acts all the more outrageous and utterly devoid of any sensitivity whatever for his subjects.

The trial record abounds with the extraordinary lengths to which defendant went to avoid contact with him. She cancelled plans, (2011) went out the back way of her residence (2275) as well as the side door at restaurants (he admitted once she left through the restaurant kitchen door) and tried to avoid him at other places she patronized (1790) (even at that, she seldom succeeded), checked to see if he were about the building, tried to hire cars with different license plates (which he promptly noted). (2011)

Whenever she knew avoidance of him was impossible, she put on "the Galella smile"– –"a pretended smile," she testified. (2513) For him this was the least desirable photographic shot. He wanted her expression off-guard. She testified:

I always try to keep smiling when Galella is there. I know he wants to catch me looking terrified. (2007)

. . . when Mr. Galella is photographing me I tried to keep a smile, keep my head up, act as normal as possible because I believe he wants to provoke an unusual response or gesture, a frightened look or shielding one's face or something, so I try to keep my head up and keep smiling. (3040)

### G. *Plaintiff's alleged grievances*

None of the incidents which plaintiff alleged were established by the evidence. Again we were confronted with the spectacle of Galella being forced to confess his perjuries. One example suffices to illustrate the pattern.

*Kennedy Airport— –October 16, 1970.* When he "deduced" that defendant would leave her apartment on October 16, 1970 and go to the Kennedy Airport Terminal for her flight to Skorpios, plaintiff followed her. There he was close enough to report which magazines she purchased at the newsstand.[37]

Plaintiff claimed that it was at the airport that day that

George [a bodyguard] twisted a strap around his neck with his camera and held him while Mrs. Onassis got in the limousine so he couldn't get pictures of her. (436)

Defendant testified she did not see George do anything to plaintiff. (298) On cross examination he was confronted with two photographs[38] admittedly taken by him. On the reverse side of each was a detailed narrative written by him but making no reference whatever to his charge of strap twisting and interference with his work.

Confronted with this apparent conflict, Galella crumbled and reluctantly confessed that nobody had prevented him from taking pictures, and that his testimony again had been false. (732–733)

---

37. Caption DX AE–GAL 32.

38. DX GAL 32, 32A.

Six additional fraudulent grievances are set forth in our supplemental findings.

## III

## THE LAW

### A. *The First Amendment*

Any injunction which would absolutely or effectively prevent plaintiff from photographing Mrs. Onassis or her children would raise a problem of prior restraint. This is true whether the Government is the sole beneficiary (the classic prior restraint), New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), or whether the relief runs in favor of Mrs. Onassis and her children, either apart from or joined with the Government. Organization for a Better Austin v. Keefe, 402 U.S. 415, 419, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); see Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

Accordingly, we must determine whether the paramount protections of the First Amendment to photograph and gather news are infringed by the relief which we have considered granting. Galella asserts that the First Amendment is a complete defense to the counterclaim and intervenor complaint. We reject this contention; it is unsupported by legal authority.

The proposition that the First Amendment gives the press wide liberty to engage in any sort of conduct, no matter how offensive, in gathering news has been flatly rejected.

*Restricted areas.* Several decisions have established that news gathering in certain places, especially by photography, may be absolutely barred, no matter how circumspect the deportment of the reporter or photographer may be. In Tribune Review Publishing Co. v. Thomas, 254 F.2d 883 (3rd Cir. 1958), the plaintiff newspaper sought to enjoin enforcement of a court rule proscribing photography in particular areas of a courthouse. In affirming the district court's denial of an injunction, the court said:

> Realizing that we are not dealing with freedom of expression at all but with rules having to do with gaining access to information on matters of public interest, can it be argued that here there is some constitutional right for everybody not to be interfered with in finding out things about everybody else? We suppose it would not be contended that a newspaper reporter or any other citizen could insist upon entering another's land without permission to find out something he wanted to know. In the same way, merely because someone's private letters might be interesting as gossip or as models of English composition it would hardly be argued that one could open another's desk and read through what he finds there. . . . We think that this question of getting at what one wants to know, either to inform the public or to satisfy one's individual curiosity is a far cry from the type of freedom of expression, comment, criticism so fully protected by the first and fourteenth amendments to the Constitution. 254 F.2d at 885.

In Matter of United Press Ass'ns v. Valente, 308 N.Y. 71, 123 N.E.2d 777 (1954), the New York Court of Appeals rejected the argument that the First Amendment gave the press an absolute right to be present at criminal trials. Judge Fuld, speaking for the court, there stated that the First Amendment:

> has . . . never been held to confer upon the press a constitutionally protected right of access to sources of information not available to others. 308 N.Y. at 77, 123 N.E.2d at 778.

In Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), the Court held that the First Amendment did not confer a right upon television stations to televise a criminal trial from the courtroom. *Id.* at 539–540, 85 S.Ct.

1628.[39] And in Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), the Court, in reversing a conviction because of prejudicial publicity, noted that the press could have been better regulated by limiting the number of reporters present, preventing them from coming inside the bar and forbidding their photographing and handling trial exhibits. *Id.* at 358, 86 S.Ct. 1507. *Cf.* Zemel v. Rusk, 381 U.S. 1, 16, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965) (Government may bar travel to Cuba although such restriction "renders less than wholly free the flow of information concerning that country. . . ."); Teague v. Regional Commissioner of Customs, Region II, 404 F.2d 441, 445 (2d Cir. 1968) (Government may regulate mail addressed to the United States even though "the regulations result in some limitation on the availability of publications and films originating in China, North Korea, and North Vietnam. To the extent of this limitation the regulations impinge on First Amendment freedoms.")

In Dietemann v. Time, Inc., 284 F. Supp. 925 (C.D.Cal.1968), aff'd, 449 F. 2d 245 (9th Cir. 1971), the court was faced with a case indistinguishable in principle from that at bar.[40] The plaintiff there was a quack healer. *Life Magazine* sent investigative reporters to his house equipped with a hidden camera and radio transmitter. They gained entrance by deceit and surreptitiously took photographs and recorded their conversation with the plaintiff. The district court held that this conduct was an actionable invasion of privacy under California law and entered judgment for plaintiff, rejecting *Life's* claim that it had a First Amendment right to engage in such conduct. 284 F.Supp. at 931–932.

The Ninth Circuit affirmed and expressly rejected the proposition that freedom of the press is a license to commit torts with impunity. Judge Hufstedler, speaking for a unanimous court on this point, said:

The defendant claims that the First Amendment immunizes it from liability . . . because its employees were gathering news and its instrumentalities are indispensable tools of investigative reporting. We agree that newsgathering is an integral part of news dissemination * * * Investigative reporting is an ancient art; its successful practice long antecedes the invention of miniature cameras and electronic devices. *The First Amendment has never been construed to accord newsmen immunity from torts or crimes committed during the course of newsgathering. The First Amendment is not a license to trespass, to steal, or to intrude by electronic means into the precincts of another's home or office.* * * * Defendant relies upon the line of cases commencing with New York Times Co. v. Sullivan (1964) 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 and extending through Rosenbloom v. Metromedia, Inc. (1971) 403 U.S. 29, 91 S. Ct. 1811, 29 L.Ed.2d 296 to sustain its contentions that (1) publication of news, however tortiously gathered, insulates defendant from liability for the antecedent tort, and (2) even if it is not thus shielded from liability, those cases prevent consideration of publication as an element in computing damages.

As we previously observed, publication is not an essential element of plaintiff's cause of action. Moreover, it is not the foundation for the invocation of a privilege. Privilege con-

---

39. *Accord,* Matter of Educational Broadcasting Corp. v. Ronan, 68 Misc.2d 776, 328 N.Y.S.2d 107 (1972) (no constitutional right to televise rate hearing).

40. "Concurrently with the development of privacy law, California had decided a series of cases according plaintiffs relief from unreasonable penetrations of their mental tranquility based upon the tort of intentional infliction of emotional distress." 449 F.2d 245, 248. We believe there is substantial evidence to suggest that an analogous development in New York may soon emerge.

cepts developed in defamation cases and to some extent in privacy actions in which publication is an essential component are not relevant in determining liability for intrusive conduct antedating publication. (*Cf.* Nimmer, 'The Right to Speak From Times to Time: First Amendment Theory Applied to Libel and Misapplied to Privacy' (1968) 56 Calif.L.Rev. 935, 957). Nothing in *New York Times* or its progeny suggests anything to the contrary. Indeed, the Court strongly indicates that there is no First Amendment interest in protecting news media from calculated misdeeds. (*E. g.*, Time, Inc. v. Hill *supra*, 385 U.S. 374, at 389–390 and 384 n. 9, 87 S.Ct. 534, 17 L.Ed.2d 456.)

No interest protected by the First Amendment is adversely affected by permitting damages for intrusion to be enhanced by the fact of later publication of the information that the publisher improperly acquired. Assessing damages for the additional emotional distress suffered by a plaintiff when the wrongfully acquired data are purveyed to the multitude chills intrusive acts. It does not chill freedom of expression guaranteed by the First Amendment. A rule forbidding the use of publication as an ingredient of damages would deny to the injured plaintiff recovery for real harm done to him without any countervailing benefit to the legitimate interest of the public in being informed. The same rule would encourage conduct by news media that grossly offends ordinary men. 449 F.2d at 249–250 (emphasis supplied.)

This position is fully supported by the commentators who agree that the First Amendment affords no privilege for intrusion. Dean Prosser, in discussing the Supreme Court's decision in Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), stated:

On Certiorari, the analogy of defamation was manifest and persuasive; and the Supreme Court applied the rule of the Sullivan case, holding the

misstatements of fact to be privileged unless it was found that they were made with knowledge of falsity or in reckless disregard of the truth. By this decision, and others which followed it, the two branches of invasion of privacy *which turn on publicity* were taken over under the Constitutional privilege. *The other two, however, are pretty clearly not.* As at common law, the celebrity can still undoubtedly complain of the appropriation of his name or likeness for purposes of advertising or the sale of a product, and so can the man in the news. And the Supreme Court decisions on intrusion have made it clear that either has as much right as anyone else to be free from intrusion into his home or his bank account. W. Prosser, Law of Torts, § 118, at 826–827 (4th ed. 1971) (emphasis supplied).

■ We conclude that the First Amendment does not license Galella to trespass inside private buildings, such as the children's schools, lobbies of friends' apartment buildings and restaurants. Nor does that Amendment command that Galella be permitted to romance maids, bribe employees and maintain surveillance in order to monitor defendant's leaving, entering and living inside her own home.

■ *Public places.* It is clear from the free speech cases that, to the extent that activities in public places involve *conduct* as opposed to *expression*, "there is no absolute constitutional immunity." In United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), the Supreme Court sustained a conviction for the burning of a draft card against the contention that the act was an expression of dissent against the Vietnam war and the military draft. In so doing, it pointed out that:

. . . even on the assumption that the alleged, communicative element in O'Brien's conduct is sufficient to bring into play the First Amendment, it does not necessarily follow that the

destruction of a registration certificate is constitutionally protected activity. This Court had held that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. 391 U.S. at 376, 88 S.Ct. at 1678; *see also* Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) (demonstration on prison grounds not constitutionally protected).

Similarly, in Cox v. Louisiana, 379 U. S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), the Court said:

We emphatically reject the notion urged by appellant that the First and Fourteenth Amendments afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech. * * * We reaffirm the statement of the Court in Giboney v. Empire Storage & Ice Co., *supra*, [336 U.S. 490] at 502, 69 S.Ct. 684, 93 L.Ed. 834, that 'it has never been deemed an abridgement of freedom of speech *or press* to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.' 379 U.S. at 555, 85 S.Ct. at 464 (emphasis supplied).

In United States v. Chalk, 441 F.2d 1277, 1280 (4th Cir. 1971), a mayor proclaimed a curfew banning persons from public places, following a civil disturbance. In holding the imposition of the curfew to have been constitutional, the Court held:

A curfew, like ordinances restricting loudspeaker noise and limiting parade permits, doubtless has an incidental effect on First Amendment rights. The standard that has developed where regulation of conduct has an incidental effect on speech is that the incidental restriction on First Amendment freedoms can be no greater than is essential to the furtherance of the government interest which is being protected.

In Hodgson v. Liquor Salesmen's Union Local No. 2, 334 F.Supp. 1369, 1380 (S.D.N.Y., 1971), the court sustained a statute prohibiting endorsements, in a union newspaper, of candidates for union office. "This statute is aimed wholly and solely at non-speech activity, although it is obviously entwined with free speech activity."

"Our highest court has made clear . . . the gross error of believing that every kind of conduct (however nonverbal and physically destructive or obstructive) must be treated simply as protected 'speech' because those engaged in it intend to express some view or position." Grossner v. Trustees of Columbia University in the City of New York, 287 F.Supp. 535, 544 (S.D.N.Y., 1968).

We do not agree with plaintiff's trial attorney who contended at trial that whenever defendant is on public property, she regards it as her private domain; in support he points to her testimony:

I consider it private when I am walking on a public street . . . I consider private errands private
. . .

Q . . . your errand is your own private business, is that what you mean?

A Yes. (2644–2647)

▮ In any event, we said at trial (1681), and now repeat, that she is a public figure. Nevertheless, the First Amendment does not immunize all conduct designed to gather information about or photographs of a public figure. There is no general constitutional right to assault, harass, or unceasingly shadow or distress public figures.

▮ *Balancing the right of privacy against the impingement on "speech".* The foregoing authorities have dealt with "speech" of substantial or even great public interest and concern. The

trial record before us, however, warrants the inquiry: Should the unremitting tortious and criminal behavior of plaintiff towards defendant over the past few years, with a very strong likelihood of its continuance, be a mandatory sacrifice she is compelled to make in order that some portion of the public may learn what she wore while walking on the public streets, or her appearance at the theater and public functions, or her department store purchases, or what she ate in restaurants? Does the Constitution insist on that too? Surely, such a contention belittles the great wisdom that is the hallmark of the Constitution.

In this case, photographs of defendant walking in Central Park, riding in automobiles, eating in restaurants, picknicking with her children, and the like, and his photograph captions indicating what magazines she has bought and what she has put in her coffee are of miniscule importance to the public. The torment inflicted upon her in the course of Galella's obtaining these photographs and bits of information clearly outweighs any interest in his obtaining such information.

Most of the courts which have considered this problem have concluded that just such a balancing test must be applied. In Kapellas v. Kofman, 1 Cal.3d 20, 81 Cal.Rptr. 360, 459 P.2d 912 (1969), the California Supreme Court noted the conflict between the individual's interest in privacy and the public interest in being informed on newsworthy matters and went on to state:

> In determining whether a particular incident is 'newsworthy' and thus whether the privilege shields its

truthful publication from liability, the courts consider a variety of factors, including the social value of the facts published, the depth of the article's intrusion into ostensibly private affairs, and the extent to which the party voluntarily acceded to a position of public notoriety. 1 Cal.3d at 36, 81 Cal.Rptr. at 370, 459 P.2d at 922; *accord*, Briscoe v. Readers Digest Association, 4 Cal.3d 529, 541, 93 Cal.Rptr. 866, 874–875, 483 P.2d 34, 42–43 (1971); Goldman v. Time, Inc., 336 F.Supp. 133 (N.D.Cal., Oct. 18, 1971); Williams v. KCMO Broadcasting Div.-Meredith Corp., 472 S.W.2d 1, 3 (Mo.App.1971); *see* Commonwealth v. Wiseman, 356 Mass. 251, 249 N.E.2d 610 (1969), cert. denied, 398 U.S. 960, 90 S.Ct. 2165, 26 L.Ed.2d 546 (1970).

The balancing test adopted explicitly in California is implicit in many privacy decisions involving the newsworthiness of public interest defense.[41] *E. g.*, Miller v. News Syndicate Co., 445 F.2d 356, 358 (2d Cir. 1971) (test is "legitimate newsworthiness"); York v. Story, 324 F.2d 450 (9th Cir. 1963), cert. denied, 376 U. S. 939, 84 S.Ct. 794, 11 L.Ed.2d 659 (1964); Cerrito v. Time, Inc., 302 F. Supp. 1071, 1073 (N.D.Cal.1969), aff'd, 449 F.2d 306 (9th Cir. 1971); Daily Times Democrat v. Graham, 276 Ala. 380, 162 So.2d 474 (1964); McAndrews v. Roy, 131 So.2d 256 (La.App.1961); Barber v. Time, Inc., 348 Mo. 1199, 159 S.W.2d 291 (1942); Binns v. Vitagraph Co. of America, 210 N.Y. 51, 58, 103 N.E. 1108 (1913); Comment, The "Titicut Follies" Case: Limiting the Public Interest Privilege, 70 Colum.L.Rev. 359 (1970).

---

41. The balancing test is also the basis for the recent decisions in Kansas Elec. Supply Co. v. Dun and Bradstreet, Inc., 448 F.2d 647 (10th Cir. 1971), cert. denied 405 U.S. 1026, 92 S.Ct. 1289, 31 L.Ed. 2d 486 (Mar. 27, 1972) (No. 71–816), and Grove v. Dun and Bradstreet, Inc., 438 F.2d 433 (3d Cir.), cert. denied, 404 U.S. 898, 92 S.Ct. 204, 30 L.Ed.2d 175 (1971), which held that the *Times* constitutional privilege does not extend to subscription credit reports because such

reports are not matters of "real" or "legitimate" public interest. Cf. Lloyd Corp., Ltd. v. Tanner, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (June 22, 1972) denying handbill distributors access to a shopping center "where adequate alternative avenues of communication exist. Such an accommodation would diminish property rights without significantly enhancing the asserted right of free speech." 92 S.Ct. 2219, 2228 (June 22, 1972).

The balancing test is responsive both to the protection of the individual's right to privacy and to the purposes of the First Amendment. Clearly, the First Amendment protects freedom of expression with respect to public affairs —matters relevant to the self-government of the nation. *E. g.*, Brennan, The Supreme Court and the Meiklejohn Interpretation of the First Amendment, 79 Harv.L.Rev. 1, 12 (1965). It extends to "all issues about which information is needed or appropriate to enable members of the society to cope with the exigencies of their period." Curtis Publishing Co. v. Butts, 388 U.S. 130, 147, 87 S.Ct. 1975, 1987, 18 L.Ed.2d 1094 (1967). Doubtless, Mrs. Onassis is a public figure, whose life has included events of great public concern. But it cannot be said that information about her comings and goings, her tastes in ballet, the food that she eats, and other minutiae which are the sole product of Galella's three years of pursuit, bear significantly upon public questions or otherwise "enable the members of society to cope with the exigencies of their period." It merely satisfies curiosity.

This analysis finds support in the reasoning of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L. Ed.2d 686 (1964), and its successors. *Times* created a privilege in defamation actions brought by public officials for *statements relating to their official conduct* on the theory that such a privilege was essential to implement "a profound national commitment to the principle that *debate on public issues* should be uninhibited, robust, and wide open

. . . ." 376 U.S. at 270, 84 S.Ct. at 721 (emphasis supplied). In Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), the privilege was extended to comments affecting the private reputation of judges because such comments were relevant to their fitness for public office. 379 U.S. at 76–77, 85 S.Ct. 209. In Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), the plurality held that the plaintiff, a state ski resort supervisor, was a public official because he had "substantial responsibility for or control over the conduct of governmental affairs." 383 U.S. at 85, 86 S.Ct. at 676. And the cases since *Rosenblatt* have all extended the privilege on the theory that important societal interests were served by free discussion of the matter contained in the allegedly defamatory publication.[42] But in no case has a court indicated that the constitutional privilege extends to *everything that finds its way into* print, no matter how irrelevant to the basic policies of the First Amendment. Indeed, the Court expressly left that question open in *Rosenbloom, supra*. 403 U.S. at 44 n. 12, 91 S.Ct. 1811.

It might be argued that the Court should not place itself in the position of drawing lines and of weighing the value of various communications so as to deny to some of them, under certain circumstances, the protection of the First Amendment. But that is what courts are for. They have not shrunk in the past from deciding whether a given individual was a "public figure" (*e. g.* Curtis Publishing Company v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967)),

42. Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) (police campaign to enforce obscenity laws); Time, Inc. v. Pape, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971); Monitor Patriot Co. v. Roy, 401 U.S. 265, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971) (comment relevant to U. S. Senate candidate's fitness for office); Ocala Star-Banner Co. v. Damron, 401 U.S. 295, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971) (fitness of candidate for tax assessor); Greenbelt Co-op. Pub. Ass'n v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) (discussion of "matters of local governmental interest and importance" *id.* at 11, 90 S.Ct. at 1540); Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967) (official conduct of court clerk); Curtis Pub. Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (football game-fixing scandal); Associated Press v. Walker, 389 U.S. 28, 88 S.Ct. 106, 19 L.Ed.2d 28 (1967) (riot concerning admission of blacks to southern university.)

whether speech created a clear and present danger (*e. g.* Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919)); see Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969)), whether a book was without redeeming social value (Roth v. United States, 354 U.S. 476, 485, 77 S. Ct. 1304, 1 L.Ed.2d 1498 (1957)), or whether the publication of the Pentagon Papers presented so grave a threat to the national security as to warrant enjoining their publication (New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)).

Not only is such an undertaking by the courts a familiar. task, but it is essential to the reconciliation of these two basic rights—privacy and freedom of speech. Moreover, virtually every commentator who has considered this question has opted for an analysis such as this. *E. g.,* Pedrick, Publicity and Privacy: Is It Any of Our Business? 20 U.Tor.L.J. 391, 404–407, 410–411 (1970); Bloustein, Privacy, Tort Law, and the Constitution: Is Warren and Brandeis' Tort Petty and Unconstitutional as Well? 46 Tex.L.Rev. 611, 624–629 (1968); Wright, Defamation, Privacy and the Public's Right to Know: A National Problem and a New Approach, 46 Tex.L.Rev. 630, 634–637 (1968); Note, The First Amendment and Tort Remedies for Invasions of Privacy, 3 U.S.F.L.Rev. 426, 441–443 (1969); *See* Case Note, 49 Tex.L.Rev. 346 (1971). Further, no court, as far as has been determined, has ever considered and rejected this approach in favor of a blanket rule that everything which is published is newsworthy and therefore constitutionally privileged.[43]

■ We see no constitutional violence done by permitting defendant to prevent intrusion on her life which serves no useful purpose.

B. *The torts committed by Galella*

Once it is recognized that the First Amendment does not immunize Galella from the consequences of wrongful conduct, it becomes plain that he must be held accountable for the commission of a variety of related torts.

■ *Assault, battery and harassment.* Generally, a civil battery is an intentional harmful or offensive contact, and a civil assault is the placing of another in reasonable apprehension of a battery. Actual physical harm is not a necessary ingredient of either tort. Masters v. Becker, 22 A.D.2d 118, 254 N.Y.S.2d 633 (2d Dept.1964); Hawkins v. Kuhne, 153 App.Div. 216, 137 N.Y.S. 1090 (2d Dept.1912); Geraty v. Stern, 30 Hun 426 (2d Dept.1883); Flamm v. Van Nierop, 56 Misc.2d 1059, 291 N.Y. S.2d 189 (S.Ct.1968); Fidler v. Murphy, 203 Misc. 51, 113 N.Y.S.2d 388 (S.Ct. 1952); Clayton v. Keeler, 18 Misc. 488, 42 N.Y.S. 1051 (S.Ct.1896); Van Voorhis v. Hawes, 12 How.Pr. 406 (1855); Restatement, Torts §§ 18, 21; W. Prosser, Law of Torts § 10, (4th Ed.1971).

■ Hence, plaintiff's persistent threatening of Mrs. Onassis' person by jumping from concealed locations, following her at close distances at high speeds and otherwise carrying out the paparazzi attack, constitutes civil assault. On those occasions when there has been an offensive contact—flicking with a camera strap, bumping, brushing—the further tort of battery was committed by Galella.

---

43. On the distinction between determining newsworthiness or public interest by accepting publication as conclusive evidence versus determining it by weighing the social importance of the information, *see* Note, The Right of Privacy: Normative Descriptive Confusion in the Defense of Newsworthiness, 30 U.Chi.L.Rev. 722 (1963). Cf. International News Service v. The Associated Press, 248 U.S. 215, 235, 39 S.Ct. 68, 63 L.Ed. 211 (1918). "The peculiar value of news is in the spreading of it while it is fresh; . . . news . . . cannot be maintained by keeping it secret." Galella's photographs were frequently unpublished for substantial periods of time while buyers were sought, and their value hardly depended "upon the promptness of transmission." *Ibid.,* p. 230, 39 S.Ct. 68, 71.

Furthermore, Section 240.25 of the New York Penal Law, McKinney's Consol.Laws, c. 40, provides:

"A person is guilty of harassment when, with intent to harass, annoy or alarm another person:

"1. He strikes, shoves, kicks or otherwise subjects him to physical contact, or attempts or threatens to do the same; or

\* \* \* \* \*

"3. He follows a person in or about a public place or places; or

\* \* \* \* \*

"5. He engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose."

 It is clear that plaintiff's conduct falls within subdivisions 1 and 3 of this statute. The only possible defense to subdivision 5 would turn on whether some trifling legitimate purpose is served. The record is replete with evidence not only that he close-shadows her in public places and has engaged in a course of conduct over a period of years which alarms, seriously annoys, and endangers Mrs. Onassis and her children, but also that his conscious purpose frequently is to produce facial expressions of annoyance or alarm.

 It is established in New York that violation of a prohibitory statute gives rise to tort liability. 34 Hillside Realty Corp. v. Norton, 198 Misc. 302, 304, 101 N.Y.S.2d 437, 440 (1950);[44] see also Martin v. Herzog, 228 N.Y. 164, 168–170, 126 N.E. 814 (1920). The only limitations on the doctrine are the familiar principles that the harm brought about by the violation must be the kind of harm which the statute sought to prevent and the plaintiff must be among the class of persons whom the statute

was designed to protect. *E. g.*, W. Prosser, Law of Torts § 36 (4th Ed.1971).

Here Mrs. Onassis is clearly among the class of persons protected by § 240.-25; she is the object of Galella's pursuit. Moreover, the annoyance, fear and worry which she has been caused by Galella's activities are plainly the effects which the statute seeks to prevent. Accordingly, violation of § 240.25 is an independent basis of liability.

 *Invasion of privacy.* Plaintiff's endless snooping constitutes tortious invasion of privacy.

We venture to suggest that faced with a factual situation comparable to the distressing one before us, with a torrent of almost unrelieved abuse into the privacy of every day activity, the New York Court of Appeals would complete the mission it has already begun of determining what should be actionable under the developing common law right of privacy. Nader v. General Motors Corp., 25 N.Y.2d 560, 307 N.Y.S.2d 647, 255 N.E.2d 765 (1970), in which the Court applied District of Columbia law.

First let us reconsider plaintiff's close-shadowing of defendant. Continuously he has had her under surveillance to the point where he is notified of her every movement. He waits outside her residence at all hours. (3368–3369) He follows her about irrespective of what she is doing: trailing her up and down the streets of New York, chasing her out of the city to neighboring places and foreign countries when she leaves for recreation or vacation, haunting her at restaurants (recording what she eats), theatres, the opera and other places of entertainment, and pursuing her when she goes shopping, getting close to her at the counter and inquiring of personnel as to her clothing purchases. (1811) His surveillance is so overwhelmingly pervasive that he has said he has not

---

44. *Accord, e. g.*, Remar v. Clayton Securities Corp., 81 F.Supp. 1014, 1017 (D. Mass.1949) (Wyzanski, J.); Phillip Metropolitan Colored Methodist Episcopal Church v. General Cas. Co. of Am., 86 Ohio App. 261, 89 N.E.2d 111, 116 (1949), aff'd, Phillip Metropolitan Colored Methodist Episcopal Church v. Wahn-Evans & Co. (General Casualty Co.), 153 Ohio St. 335, 91 N.E.2d 686 (1950).

married because he has been unable to "get a girl who would be willing to go looking for Mrs. Onassis at odd hours." (3999–4000)

He studies her habits, the operations of her household and the procedures of the Secret Service in guarding her children. (731–735) He has kept her under such close observation for so long a period of time that he has commented at considerable length on her personality, her shopping tastes and habits, and her preferences for entertainment. (3658–3659, 3679, 1803–1806) With evident satisfaction, he referred, while testifying, to his "usual habitual observation." (735) He has intruded into her children's schools, hidden in bushes and behind coat racks in restaurants, sneaked into beauty salons, bribed doormen, hatcheck girls, chauffeurs, fishermen in Greece, hairdressers and schoolboys, and romanced employees. (1767, 1772–1774) In short, Galella has insinuated himself into the very fabric of Mrs. Onassis' life and the challenge to this Court is to fashion the tool to get him out.

We return now to *Nader*. The Court there sustained the sufficiency of allegations to the effect that plaintiff's "right of privacy" under District of Columbia law had been violated by defendant's activities which consisted of surveillance, shadowing, eavesdropping, and others not here relevant.

Chief Judge Fuld, for the Court, wrote:

> There are . . . allegations that the appellant hired people to shadow the plaintiff and keep him under surveillance. In particular, he claims that, on one occasion, one of its agents followed him into a bank, getting sufficiently close to him to see the denomination of the bills he was withdrawing from his account. From what we have already said, it is manifest that the mere observation of the plaintiff in a public place does not amount to an invasion of his privacy. But, under certain circumstances, surveillance may be so 'overzealous' as to

render it actionable. (See Pearson v. Dodd, 133 U.S.App.D.C. 279, 410 F.2d 701, 704, *supra*; Pinkerton Nat. Detective Agency, Inc. v. Stevens, 108 Ga.App. 159, 132 S.E.2d 119) . . . A person does not automatically make public everything he does merely by being in a public place, and the mere fact that Nader was in a bank did not give anyone the right to try to discover the amount of money he was withdrawing. 25 N.Y.2d at 570, 307 N.Y.S.2d at 655, 255 N.E.2d at 771.

Concurring, Judge Breitel gave it as his opinion:

> [I]t does not strain credulity or imagination to conceive of the systematic 'public' surveillance of another as being the implementation of a plan to intrude on the privacy of another. Although acts performed in 'public,' especially if taken singly or in small numbers, may not be confidential, at least arguably a right to privacy may nevertheless be invaded through extensive or exhaustive monitoring and cataloguing of acts normally disconnected and anonymous. 25 N.Y.2d at 572, 307 N.Y.S.2d at 657, 255 N.E.2d at 772. (Concurring opinion joined in by Burke and Jasen, JJ.)

As we see it, Galella's conduct falls within the formulation of the right of privacy as expressed in the opinion. The surveillance, close-shadowing and monitoring were clearly "overzealous" and therefore actionable. Moreover, Galella's corruption of doormen, romancing of the personal maid, deceptive intrusions into children's schools, and return visits to restaurants and stores to inquire about purchases were all exclusively for the "purpose of gathering information of a private and confidential nature" which Judge Fuld found to be actionable. (*Nader*, 25 N.Y.2d at 569, 307 N.Y.S.2d at 654, 255 N.E.2d at 770.)

Does the law of New York differ from the law of the District of Columbia as declared by New York's highest court? The dictum in Roberson v. Rochester

Folding-Box Co., 171 N.Y. 538, 64 N.E. 442 (1902), does not support the conclusion that invasion of privacy is not actionable under New York law. As Dean Prosser has pointed out, "The law of privacy comprises four distinct kinds of invasion of four different interests of the plaintiff, which are tied together by the common name, but otherwise have almost nothing in common . . .": (i) commercial appropriation of one's name or likeness, (ii) intrusion, (iii) public disclosure of private facts and (iv) publicity which places the plaintiff in a false light in the public eye. W. Prosser, Law of Torts § 117 at 804–12 (4th ed. 1971); *accord*, Restatement (Second) Torts, § 652A (tent.draft 1967). Note, Torts: Unnecessary Analysis of Elements of Right of Privacy by Court of Appeals: A Possible Basis for Extension of the Tort in New York? 36 Bklyn.L.Rev. 507, 513 (1970). *Roberson* involved the commercial appropriation of a likeness, which, Dean Prosser teaches has "almost nothing in common" with intrusion, the gravamen of the case at bar.

 Even assuming, *arguendo*, that the *Roberson* dictum about "right of privacy" were taken to include intrusions, it appears to us the New York Court of Appeals would not follow it today. Since this Court is bound to apply the law as it believes the New York Court of Appeals would today apply it,[45] it is not bound by *Roberson* and should recognize a cause of action for intrusion here.

There are several indications that *Roberson* would no longer survive a direct test in the Court of Appeals. For one thing, the extensive analysis of the various facts alleged in *Nader, supra*, 25 N.Y.2d 560, 307 N.Y.S.2d 647, 255 N.E. 2d 765—an analysis wholly unnecessary to the disposition of that appeal—may well be taken as an effort by the Court of Appeals to "provide a foundation for the acceptance of invasion of privacy by intrusion in New York." Note, 36 Bklyn.L.Rev. 507, 508 (1970). Moreover, Judge Breitel hinted broadly what that Court might do were the case to arise under New York law when he noted that the Court "thus far" had not recognized a common law privacy cause of action. 25 N.Y.2d at 573, 307 N.Y.S. 2d at 658, 255 N.E.2d at 773.

Subsequent to *Nader*, at least one lower New York court has analyzed the New York right of privacy in terms of the common law, rather than the Civil Rights Law. DeLury v. Kretchmer, 66 Misc.2d 897, 899, 322 N.Y.S.2d 517, 519 (S.Ct.1971).

Then too, New York has now enacted § 240.25(3) and (5) of the Penal Law recognizing the importance of protecting the "right to be left alone."

*Roberson*, moreover, has been sharply criticized by both federal and lower New York State courts. *E. g.*, Peay v. Curtis Publishing Co., 78 F.Supp. 305, 307 (D. D.C.1948) (Holtzoff, J.); Spahn v. Julian Messner, Inc., 43 Misc.2d 219, 221, 250 N.Y.S.2d 529, 532 (S.Ct.1964), aff'd, 23 A.D.2d 216, 260 N.Y.S.2d 451 (1st Dep't 1965), aff'd, 18 N.Y.2d 324, 274 N.Y.S.2d 877, 221 N.E.2d 543 (1966), vacated, 387 U.S. 239, 87 S.Ct. 1706, 18 L.Ed.2d 744, aff'd, 21 N.Y.2d 124, 286 N.Y.S.2d 832, 233 N.E.2d 840 (1967), prob. juris. noted, Julian Messner, Inc. v. Spahn, 393 U.S. 818, 89 S.Ct. 80, 21 L.Ed.2d 91 (1968); *see* Garner v. Triangle Publications, Inc., 97 F.Supp. 546, 548 (S.D.N.Y.1951) (Kaufman, J.).

Since the *Roberson* dictum was enunciated, freedom from extensive shadowing and observation has come to be protected in most other jurisdictions. In Pinkerton National Detective Agency, Inc. v. Stevens, 108 Ga.App. 159, 132 S.

45. Where a district court, applying state law, concludes that the state's highest court would not adhere to its earlier statement of the law, the district court must hold as it believes the state court would hold today. See, e. g. Warner v. Gregory, 415 F.2d 1345 (7th Cir. 1969), cert. denied, 397 U.S. 930, 90 S.Ct. 817, 25 L.Ed.2d 112 (1970); Cooper v. American Airlines, Inc., 149 F.2d 355, 359 (2d Cir. 1945); C. Wright, Federal Courts 58, at 238–239 (2d ed. 1971).

E.2d 119 (1963) (cited by Judge Fuld, *supra*), the court held that following the plaintiff closely in public places, *inter alia*, was an invasion of her privacy. Likewise, in Souder v. Pendleton Detectives, Inc., 88 So.2d 716 (La.App.1956), the court sustained a cause of action based on obtrusive surveillance. And many years ago, in Schultz v. Frankfort Marine, Accident & Plate Glass Insurance Co., 151 Wis. 537, 139 N.W. 386 (1913), the Wisconsin Supreme Court held that open, public and persistent following of the plaintiff in public places was actionable. *Accord*, S. Hofstadter and G. Horowitz, The Right of Privacy § 9.3 (1964); *see* Alabama Electric Co-Op, Inc. v. Partridge, 284 Ala. 442, 225 So.2d 848 (1969); Bennett v. Norban, 396 Pa. 94, 151 A.2d 476 (1959). Prosser has noted that "the right of privacy is by this time recognized and accepted in all but a very few jurisdictions." Prosser, *supra* § 117, at 804.

The rejection of the old thinking that supported the *Roberson* dictum, in such cases as Battalla v. State, 10 N.Y.2d 237, 219 N.Y.S.2d 34, 176 N.E.2d 729 (1961); Tobin v. Grossman, 24 N.Y.2d 609, 301 N.Y.S.2d 554, 249 N.E.2d 419 (1969) (recognizing cause of action despite anticipated proliferation of claims); and Ferrara v. Galluchio, 5 N.Y.2d 16, 176 N.Y.S.2d 996, 152 N.E.2d 249 (1958) (protecting freedom from mental disturbance), is the final factor which persuades us that *Nader* foreshadows the course which the Court of Appeals of the State of New York would follow today in dealing with intrusions upon the right of privacy.

*Tortious infliction of emotional distress.* We will not here attempt to encapsule the physical movements, offensive mouthings, relentlessness, self-aggrandizement, "pay-off" seeking and "secret agent" tactics of "The only American Paparazzo."

■■■ "Freedom from mental disturbance is now a protected interest in this [New York] state." Ferrara v. Galluchio, 5 N.Y.2d 16, 21, 176 N.Y.S.2d 996, 999, 152 N.E.2d 249, 252 (1958).

"[T]here may be recovery for the intentional infliction of mental distress without proof of the breach of any duty other than the duty to refrain from inflicting it." Halio v. Lurie, 15 A.D.2d 62, 66, 222 N.Y.S.2d 759, 763 (2d Dep't 1961); *accord*, Mitran v. Williamson, 21 Misc.2d 106, 108, 197 N.Y.S.2d 689, 691 (S.Ct.1960).

All that is required in the way of intent is that emotional distress be reasonably foreseeable to the actor. As the court held in *Mitran*:

"Actual intent to cause emotional disturbance is not necessary since the wilful wrongdoer may be charged with the duty of foreseeing the mental and emotional consequences that would naturally flow from his conduct. . . . ." 21 Misc.2d at 109, 197 N.Y.S.2d at 692.

In Nader v. General Motors Corp., *supra*, Chief Judge Fuld stated:

"[W]here severe mental pain and anguish is inflicted through a deliberate and malicious campaign of harassment or intimidation, a remedy is available in the form of an action for the intentional infliction of emotional distress." 25 N.Y.2d at 569, 307 N.Y.S.2d at 654, 255 N.E.2d at 770.

■■■ We find this standard met. "Malice, however, does not mean alone personal ill will. It may also mean such a wanton and reckless disregard of the rights of another as is ill-will's equivalent." American Guild of Musical Artists, Inc., et al. v. Petrillo, 286 N.Y. 226, 231, 36 N.E.2d 123 (1940); Pecue v. West, 233 N.Y. 316, 323, 135 N.E. 515, 517 (1922); Lamb v. S. Cheney & Sons, 227 N.Y. 418, 421, 125 N.E. 817 (1920).

In Flamm v. Van Nierop, 56 Misc.2d 1059, 291 N.Y.S.2d 189 (S.Ct.1968), the court dealt with conduct similar to Galella's. There the complaint sought damages and injunctive relief upon allegations that:

"since October, 1966, the defendant has done the following: Dashed at the plaintiff in a threatening manner in various public places, with 'threaten-

ing gestures, grimaces, leers, distorted faces and malign looks,' accompanied by 'ridiculous utterances and laughs'; driven his automobile behind that of the plaintiff at a dangerously close distance, walked closely behind, or beside, or in front of the plaintiff on the public streets. . . ." 56 Misc.2d at 1060, 291 N.Y.S.2d at 190.

The court held that the complaint stated a cause of action for intentional infliction of emotional distress, saying:

"If a man finds himself perpetually haunted by an enemy; if he is greeted at every turn by baleful looks, sudden sorties which fall short of physical contact, and derisive laughter; if he cannot drive his car without the imminent threat of a collision from the rear; and if he is troubled at all hours by telephone calls followed only by silence, then it can hardly be doubted that he is being subjected to the extreme and outrageous conduct which gives rise to a cause of action in tort." 56 Misc.2d at 1061, 291 N.Y.S.2d at 191.

We find that the totality of plaintiff's conduct was extreme, intentional and outrageous, and that the emotional distress experienced by defendant and her children was severe and reasonably so. The record demonstrates there is substantial basis for their reactions and concerns; they were indeed harassed, threatened and denied privacy by plaintiff's offensive conduct. The proof establishes the tortious infliction of mental distress.

■■■ *Constitutional right of privacy.* The Constitution itself creates a right of privacy. The First Amendment protects the right of freedom of association. The Fourth Amendment protects the individual from unreasonable searches and seizures. The Fifth Amendment and its privilege against self-incrimination safeguards the individual in a zone of privacy into which the Government may not intrude, and the Ninth Amendment provides that the enumeration in the Constitution of certain rights shall

not be construed to deny or disparage others retained by the people. *See generally* Beaney, The Constitutional Right to Privacy, 1962 Sup.Ct.Rev. 212.

Apart from these specific safeguards, the Supreme Court has recognized that "specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance." Griswold v. Connecticut, 381 U.S. 479, 484, 85 S. Ct. 1678, 1681, 14 L.Ed.2d 510 (1965). The court in *Griswold* found that those penumbras protected a right of marital privacy which prevented the states from regulating the dissemination of contraceptives to married couples.

At least two Federal courts have accepted the proposition that the Constitution guarantees freedom from intrusive invasions of privacy. In Dietemann v. Time, Inc., 284 F.Supp. 925 (C.D.Cal. 1968), aff'd without consideration of the point, 449 F.2d 245 (9th Cir. 1971), the Court, in dealing with an action for invasion of privacy premised on intrusion into a person's home, said:

At the outset defendant is met with the proposition that although freedom of speech and freedom of press are constitutional guarantees, so is the right of privacy. [Griswold v. State of Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d at 510.] While the courts may be required under some circumstances to balance the rights and privileges when the constitutional guarantees of freedom of speech and press clash with the right of privacy, there would appear to be no basis to give greater weight or priority to any one of these constitutional guarantees. 284 F.Supp. at 929.

And, in the recent decision in People by Ford v. Doorley, 338 F.Supp. 574 (D. R.I., Feb. 10, 1972), the Court in enjoining picketing of the home of an official, noted that the right of privacy comprehends freedom from such intrusion and is constitutional in origin. *Id.* at 576.

As the Supreme Court stated in Public Utilities Comm. v. Pollak, 343 U.S.

451, 464, n.10, 72 S.Ct. 813, 821, 96 L. Ed. 1068 (1952) concerning Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L. Ed. 513 (1941):

> The interest of some unwilling listeners was there held to justify some limitation on the freedom of others to amplify their speech. The decision, however, did not indicate that it would violate constitutional rights of privacy or due process for the city to authorize some use of sound trucks and amplifiers in public places.

This decision antedated *Griswold* by almost two decades and recognized that there are "constitutional rights of privacy."

■ The essence of the privacy interest includes a general "right to be left alone," and to define one's circle of intimacy; to shield intimate and personal characteristics and activities from public gaze; to have moments of freedom from the unremitted assault of the world and unfettered will of others in order to achieve some measure of tranquality for contemplation or other purposes, without which life loses its sweetness. The rationale extends to protect against unreasonably intrusive behavior which attempts or succeeds in gathering information, Note, 83 Harv.L.Rev. 1923 (1970), and includes, but is not limited to, such disparate abuses of privacy as the unreasonable seeking, gathering, storing, sharing and disseminating of information by humans and machines.[46]

It has been cogently suggested that the right to privacy proscribes dehumanizing conduct which assaults "liberty, personality and self-respect." Fried, Privacy, 77 Yale L.J. 475, 485 (1968).

■■ The claim that this constitutional right runs only against "state action" overlooks the fact that the act of a court—even the entry of a judgment denying relief—is state action within the meaning of the Fourteenth Amendment. *E. g.*, Brotherhood of Railroad Trainmen v. Virginia ex rel. Virginia State Bar, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964); Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957); Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L. Ed. 1586 (1953); Shelley v. Kraemer, 334 U.S. 1, 14–18, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). Hence, the denial of relief in this case—relief essential to vindicate a basic human and constitutional right—would itself violate the Constitution.

This was explicitly so held by the New York Supreme Court in Nader v. General Motors Corp., 57 Misc.2d 301, 292 N. Y.S.2d 514, 518. There, in response to defendant's motion to dismiss a cause of action for intrusive invasion of privacy in New York, the plaintiff argued that even if the court were to conclude that there was no common law right of privacy in New York, it was compelled to recognize such a right on constitutional grounds. The Court at Special Term agreed. In denying the motion to dismiss the Court held:

> However, there is presented a constitutional right of plaintiff to privacy—a right to be left alone. The right of privacy stands on high ground, cognate to the values and concerns protected by constitutional guarantees (See: 4th, 5th, 14th Amendments, Fed.Constit.; Tehan v. United States ex rel. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453; Griswold v. State of Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510; Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161; Afro-American Publishing Co. v. Jaffe, 125 U.S.App.D.C. 70, 366 F.2d 649).

> Under the circumstances, the court is constrained to allow the second cause of action to stand on constitutional grounds.[47]

---

46. *See* A. Miller, The Assault on Privacy: Computers, Data Banks and Dossiers (Signet, 1971); J. Rosenberg, The Death of Privacy, (Random House, 1969); A. Westin, Privacy and Freedom, (Antheneum, 1967).

47. This holding at Special Term was not considered by either of the appellate

Indeed, defendant's "right to be left alone" is exactly what plaintiff relentlessly invaded as the trial record here overwhelmingly demonstrates.

*Civil Rights Law.* By sending the Christmas card to editors, Galella gave grounds for a private action under the Civil Rights Law.

New York Civil Rights Law §§ 50 and 51 provide in relevant part:

§ 50. A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person, or if a minor of his or her parent or guardian, is guilty of a misdemeanor.

§ 51. Any person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided may maintain an equitable action . . . . against the person . . . so using his name, portrait or picture, to prevent and restrain the use thereof . . .

This statute has been narrowly construed and, apart from sending the Christmas card to editors, none of Galella's conduct is within its scope.

Directing the Christmas card to editors, however, amounted to advertising for Galella. Pagan v. New York Herald Tribune, Inc., 32 A.D.2d 341, 343, 301 N.Y.S.2d 120, 122 (1st Dep't 1969). Plaintiff could not put the photograph of defendant on his business card without her consent; the Christmas card does precisely that. Furthermore, the communication is not in one of the media but is a private circulation. None of the problems of traditional press considerations are therefore present.

There is a continuing threat of plaintiff's commercial appropriation, Rosemont Enterprises v. Choppy, Dkt. No. 3783–72 (S.Ct.N.Y.Co.), aff'd 332 N.Y. S.2d 1004 (App.Div. 1st Dept., 1972) in the context of the totality of plaintiff's self-aggrandizement.

C. *Defendant has breached no duty owed plaintiff*

Although we have found that no disputed allegation of the complaint was sustained by credible evidence, so that plaintiff's claim must be rejected in its entirety, we regard it our obligation to consider the legal sufficiency of the complaint.

The trial record contains evidence pertaining to thirteen incidents which Galella claims supports his right to relief. Six of these incidents (specifically alleged, Complt. ¶¶ 4–23) [48] were introduced on both the damage and injunctive aspects of the plaintiff's case. Seven incidents (not specifically alleged in the complaint) [49] were introduced solely on the fourth cause of action which seeks an injunction.

The alleged grievances involved a Secret Service agent standing between plaintiff and defendant or her children; an agent waiving a towel in front of plaintiff's camera; defendant allegedly asking a waiter to get the police or allegedly telling police that plaintiff was annoying her or requesting a policeman to ask plaintiff to take his photographs of her outside an airline terminal;

courts in *Nader* because of a stipulation that District of Columbia law governed the second cause of action. Nader v. General Motors Corp., supra, 31 A.D. 2d 392, 298 N.Y.S.2d 137 (1st Dept. 1969), aff'd, 25 N.Y.2d 560, 307 N.Y. S.2d 647, 255 N.E.2d 765 (1970).

48. (1) September 21, 1969—Kennedy Airport; (2) September 21, 1969—1040 Fifth Avenue; (3) September 24, 1969—bicycle incident; (4) May 16, 1970—Cyclax; (5) May 17, 1970—Metropolitan Opera; and (6) July 22, 1970—Skorpios. The Skorpios incident does not allege participation by Mrs. Onassis in the activity complained of.

49. (1) August 24, 1970—Capri; (2) November 12, 1970—movie screening; (3) January 3, 1971—Central Park—sledding; (4) January 17, 1971—King Karol record store; (5) February 20, 1971—Kennedy Airport; (6) October 4, 1971—tennis incident; and (7) October 6, 1971—Central Park—Agent Tully.

agents allegedly pushing plaintiff away from the entrance to defendant's residence while she attempted to enter and other similar alleged pushings of him by agents.

Hardly anything more than a faint glimmer of evidence was adduced to show that Mrs. Onassis was in any way responsible for anything which may have happened to plaintiff on any such occasions. Further, we find that the pushings never happened, with the exception of the justified pushing following the movie screening.

■ Additionally, much of the conduct complained of is not actionable. If, while walking on the street, Mrs. Onassis chose to shield herself from plaintiff by putting on sun glasses or a veil, plaintiff suffered no actionable wrong. If instead, she walked behind somebody or asked another to stand in front of her, plaintiff has no right of action even though what she purposely did may have "interfered" with his photographing her. A photographer cannot direct an unwilling subject to pose, to wear only clothing which he dictates, or to perform according to his requirements any more than one without a camera could do so.

Remedies are available for interference with contractual relations [50] or prospective business advantage.[51] As to the former there are no contractual duties running to the plaintiff. As to the latter, there is no proof that the conduct of defendant forced or induced others not to deal with plaintiff.[52]

■ Mere failure to enter into contractual relations, pose for photographs, grant interviews, even acknowledge another's presence, are without remedy by the one who is shunned. This is true even if such a privileged boycott completely deprives another of his chosen pursuit.

### D. Intervenor complaint

■ The Government is entitled to an injunction against interference with the protective duties of the United States Secret Service. 18 U.S.C. § 3056.[53]

The statute envisages situations which, in the judgment of the Congress, include matters of protection important to national security. It is of concern to the nation that present and former First Families be secure in their person.[54]

The relative quiet of private life in no way insulates against the dangers which persons formerly exposed to the most intense publicity may continue to attract. This is particularly so with Mrs. Onassis

---

50. Hornstein v. Podwitz, 254 N.Y. 443, 173 N.E. 674 (1923).

51. Prosser, Law of Torts at 949–950 (4th Ed. 1971).

52. The authorities of Federal Waste Paper Corp. v. Garment Center Capitol, Inc., 268 App.Div. 230, 51 N.Y.S.2d 26 (1st Dept.1944) ; Tappan Motors, Inc. v. Waterbury, 65 Misc.2d 514, 318 N.Y. S.2d 125 (S.Ct.1971) and International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918) are inappropriate.

53. § 3056. Secret Service powers
(a) Subject to the direction of the Secretary of the Treasury, the United States Secret Service, Treasury Department, is authorized to protect the person of the President of the United States, the members of his immediate family, the President-elect, the Vice President or other officer next in the order of succession to the office of President, and the Vice President-elect; protect the person of a former President and his wife during his lifetime, the person of the widow of a former President until her death or remarriage, and minor children of a former President until they reach sixteen years of age, unless such protection is declined; * * *

54. The distinguished Chairman of the House Judiciary Committee, Congressman Celler, spoke to this point:
Former Presidents and the wives of former Presidents are individuals who are sought after. They are in the limelight. They are singled out and often they are annoyed by the idle curious. Sometimes they are the targets of the mentally deranged. They are subject to threats by those who imagine grievances . . . I am informed, she is frightened for the sake of her children.
Cong.Rec. pp. 22157–22158 (September 7, 1965)

and her children irrespective of their desires in the matter.

Injunctive relief appears appropriate either as implicit in the statute or on common law principles of equity. The manifold threats to which the minor children of a former president may be exposed requires the most flexible legal tools to protect them, a task for which equity has traditionally been well suited. To protect the minor children requires far more than mere physical intervention to halt the heinous lunatic. Galella's outrageous behavior, reckless indeed to the children's safety, may well result in the same frightening consequences as would follow from one who intentionally sets out to harm the children. The bicycle, tennis, horse show, Lincoln Center, sledding, Skorpios, Oliver, screening of a film, and high-speed vehicle chase episodes are only a few examples of conduct which bear this out. The irreparable injury which may result from interference with the Secret Service protective function warrants equitable intervention.

Plaintiff goes far, indeed. Not only does he impair the objective of the Secret Service function––the protection of the children––but he severely and independently impairs the means by which the Secret Service goes about achieving its objective of protecting its charges. The Secret Service file (GX BK) is replete with episodes where his antics have blocked the path of Secret Service agents, and where he repeatedly ignored their well-founded requests and otherwise severely limited their ability effectively to protect the children.

A further reason commends itself. The law insists upon the peaceful resolution of disputes where at all possible without resort to force. Where it is not imperative that force be used to avert immediate physical danger to Secret Service charges, injunctive relief, particularly against recurring conduct potentially dangerous, should be made available.

We see merited justification for the equitable relief sought.

### E. Private injunctive relief

 Permanent injunctive relief is available where there is no adequate remedy at law, where the balance of the equities favor the moving party, and where success on the merits (probability of success for a preliminary injunction) have been demonstrated. As we have already dealt with the merits, we confine the present analysis to the first two points. See Dino De Laurentiis Cinematografica, S.p.A. v. D–150, Inc., 366 F.2d 373, 375 (2d Cir.1966).

 *No adequate remedy at law.* We conclude there is no adequate remedy at law because of: the recurrent nature of plaintiff's invasions of defendant's rights; the need for a multiplicity of damage actions to assert defendant's rights; the imminent threat of continued emotional and physical trauma; and the difficulty of evaluating the injuries in this case in monetary terms. W. de Funiak, Handbook of Modern Equity §§ 19–22 (2d Ed.1956); see Wilson v. Illinois Southern Railway Co., 263 U.S. 574, 44 S.Ct. 203, 68 L.Ed. 456 (1924); Walla Walla v. Walla Walla Water Co., 172 U.S. 1, 19 S.Ct. 77, 43 L.Ed. 341 (1898); Lewis v. Kugler, 446 F.2d 1343, 1350 (3rd Cir.1971); Roof v. Conway, 133 F. 2d 819, 827 (6th Cir.1943); Local Union 499, I.B.E.W. v. Iowa Power & Light Co., 224 F.Supp. 731, 738 (S.D.Iowa 1964).

 Equity will not enjoin torts [55] where the remedy at law is ade-

---

55. To the extent that plaintiff relies on the notion that equity will not protect personal, as opposed to property, rights, this theory has been thoroughly and properly discredited. *E. g.*, Sedler, Injunctive Relief and Personal Integrity, 9 St. Louis U.L.J. 147, 148–49 (1964); *see also* Note, Equitable Prevention of Public Wrongs, 14 Tex.L.Rev. 427, 438–439 (1936); Long, Equitable Jurisdiction to Protect Personal Rights, 33 Yale L.J. 115 (1923); Pound, Equitable Relief Against Defamation and Injuries to Personality, 29 Harv.L.Rev. 640, 668 (1916); Note, Developments in the Law—Injunctions, 78 Harv.L.Rev. 994, 989–1001 (1965).

quate, as it often is. Alberti v. Cruise, 383 F.2d 268 (4th Cir.1967); Kessler v. General Services Administration, 236 F. Supp. 693 (S.D.N.Y.) aff'd, 341 F.2d 275 (2d Cir.1964).

In Clemons v. Board of Education, 228 F.2d 853 (6th Cir.), cert. denied, 350 U. S. 1006, 76 S.Ct. 651, 100 L.Ed. 868 (1956), the Sixth Circuit adopted Pomeroy's formulation:

> "In determining whether an injunction will be issued to protect any right of property, to enforce any obligation, or to prevent any wrong, there is one fundamental principle of the utmost importance, which furnishes the answer to any questions, the solution to any difficulties which may arise. This principle is both affirmative and negative, and the affirmative aspect of it should never be lost sight of, any more than the negative side. The general principle may be stated as follows: Wherever a right exists or is created, by contract, by the ownership of property or otherwise, cognizable by law, *a violation of that right will be prohibited*, unless there are other considerations of policy or expediency which forbid a resort to this prohibitive remedy. *The restraining power of equity extends, therefore, through the whole range of rights and duties which are recognized by the law, and would be applied to every case of intended violation, were it not for certain reasons of expediency and policy which control and limit its exercise.* This jurisdiction of equity to prevent the commission of wrong is, however, modified and restricted by considerations of expediency and of convenience which confine its application to those cases in which the legal remedy is not full and adequate. Equity will not interfere to restrain the breach of a contract, or the commission of a tort, or the violation of any right, *when the legal remedy of compensatory damages would be complete and adequate.* The incompleteness and inadequacy of the legal remedy is the criterion which, under the settled doctrine, determines the right to the equitable remedy of injunction." 4 Pomeroy, Equity Jurisprudence § 1338, at 935–36 (5th ed.) (emphasis partly in original and partly supplied), quoted with approval in Clemons v. Board of Education, 228 F.2d at 856; *see* Lewis v. Kugler, 446 F.2d 1343, 1349–1351 (3rd Cir.1971).

This conclusion is supported by New York law. As noted above, Flamm v. Van Nierop, 56 Misc.2d 1059, 291 N.Y. S.2d 189 (S.Ct.1968), expressly sanctioned injunctive relief in a case remarkably similar to this one:

> "The second cause of action is a repetition of the first, with the additional allegation that the *defendant's conduct still continues and will continue in the future, resulting in irreparable injury* to the plaintiff. Under that cause of action the plaintiff demands injunctive relief, in addition to the money damages demanded in the first cause of action. The court is of the opinion *that both* forms of relief are available upon proper proof." 56 Misc.2d at 1061, 291 N.Y.S.2d at 192 (emphasis supplied). Cf. Weicker v. Weicker, 22 N.Y.2d 8, 290 N.Y.S.2d 732, 237 N.E.2d 876 (1968).

The record demonstrates that Galella's surveillance and harassment of Mrs. Onassis has already gone on for a number of years and will continue, by his own account, for "another four or five years." (1348 Freeman) Hence, Mrs. Onassis' legal remedies are inadequate on this ground alone.

■ *Balance of the equities.* The equities clearly balance in favor of defendant, particularly in view of our order which is addressed to protecting Galella's ability to continue his livelihood and our expressed willingness throughout the trial to receive evidence showing that the distances heretofore provided were unduly burdensome. Galella's attitude toward his subjects as well as to the orders of this Court are not impressive landmarks on his journey to establishing a balance of the equities in his favor.

One cannot violate another's rights, thereby reaping an ill-gotten profit, and then resist injunctive relief on the ground that it will prevent him from making similar future profits. In the face of such a situation, the Chancellor does not smile.

The injunction contemplated does not "put Galella out of business" as he has claimed—it merely moderates the way he can conduct himself in the pursuit of that "business."

We regarded the portion of the proposed order which would have completely prevented Galella from photographing Mrs. Onassis or her children to be clearly overbroad, struck it, and will not include it in a final order. Galella's occupation is lawful and the objective of the order is to modify his conduct, not to prevent his photography.

For practical reasons, the injunction cannot be couched in terms of prohibitions upon Galella's leaping, blocking, taunting, grunting, hiding and the like. Nor have abstract concepts—harassing, endangering—proved workable. No effective relief seems possible without the fixing of proscribed distances.

We must moreover make certain plaintiff keeps sufficiently far enough away to avoid problems as to compliance with the injunction and injurious disobedience. Disputes concerning his compliance may be frequent, thereby necessitating repeated application to the Court. Hence, the restraint must be clear, simple and effective so that Galella's substantial compliance cannot seriously be disputed unless a violation occurs.

Of major importance in determining the scope of the relief to be afforded here is the attitude which Galella has demonstrated toward the process of this Court in the past. Galella blatantly violated our restraining orders of October 8 and December 2, 1971. He did so deliberately and in full knowledge of the fact of his violation. His deliberate disobedience to the subpoena and his attempts to obstruct justice with respect to Exhibit G, together with the perjury that infected his testimony, do not warrant mere token relief.

In light of Galella's repeated misbehavior, it is clear that only a strong restraint—an injunction which will clearly protect Mrs. Onassis' rights and leave no room for quibbling about compliance and no room for evasion or circumvention—is appropriate in this case.

In FTC v. Ruberoid Co., 343 U.S. 470, 72 S.Ct. 800, 96 L.Ed. 1081 (1952), the Supreme Court sustained a sweeping order of the Federal Trade Commission, saying:

"If the Commission is to attain the objectives Congress evisioned, it cannot be required to confine its road block [the scope of the injunctive relief in question] to the narrow lane the transgressor has travelled; it must be allowed effectively to close all roads to the prohibitive goal, so that its order may not be by-passed with impunity." Id. at 473, 72 S.Ct. at 803.

Necessarily the fixing of proscribed distances will occasionally place plaintiff at a disadvantage compared with photographers whose behavior is more civil. But as the Seventh Circuit observed in granting a trade secret injunction:

"[B]y its inequitable conduct, appellant has precluded itself from enjoying the rights of the general public to the patent disclosure . . ." Shellmar Products Co. v. Allen-Qualley Co., 87 F.2d 104, 108 (7th Cir.1936), cert. denied, 301 U.S. 695, 57 S.Ct. 923, 81 L.Ed. 1350 (1937).

As for the actual distance to be proscribed, we must bear in mind that plaintiff never moved to modify the distances heretofore imposed by our restraining order, even after the Court had clearly and explicity invited him to do so if he could prove it was too harsh. (Minutes, Proceedings January 19, 1972, p. 31)

## IV

## CONTEMPTS

A. *The October 8, 1971 temporary restraining order*

By order of October 8 (extended October 28), 1971, this Court, after hearing

argument by both plaintiff and defendant, entered a temporary restraining order set forth above.

We find Galella violated this order on November 28, 1971 and December 1, 1971, and hold him in remedial civil contempt.[56] We have already detailed the facts surrounding these occurrences. They constitute a clear violation of 18 U.S.C. § 401(3).

## B. *The subpoena*

Galella was served with a subpoena to appear for a deposition and to produce documents and things. (DX D; 657–59) We have dealt with this hereinabove.

We need not recapitulate the exhibit G fiasco. Galella's own admissions demonstrate his willful failure to comply with the subpoena. Fed.R.Civ.P. 45(f). His "excuse" for not producing that exhibit and others is arrant nonsense. His motive was to suppress relevant evidence and he is plainly in contempt for violating the subpoena. Nilva v. United States, 352 U.S. 385, 77 S.Ct. 431, 1 L.Ed.2d 415 (1957).

Even were he not personally served, Galella violated the subpoena. Galella admittedly received the subpoena and had actual notice of it prior to his deposition. (1075) Not only was no objection made then to the manner of service but his counsel agreed to produce documents called for by the subpoena including those which Galella suppressed (658). He knew he was obligated to

---

56. 18 U.S.C. § 401. *Power of court*

A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

(2) Misbehavior of any of its officers in their official transactions;

(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command. June 25, 1948, c. 645, 62 Stat. 701

Fed.R.Civ.P. 45(f)

"Failure by any person without adequate excuse to obey a subpoena served upon him may be deemed a contempt of the court from which the subpoena issued."

Local Rule 14. *Contempts*

(a) A proceeding to adjudicate a person in civil contempt of court, including a case provided for in Rule of Civil Procedure 37(b)(2)(iv), shall be commenced by the service of a notice of motion or order to show cause. The affidavit upon which such notice of motion or order to show cause is based shall set out with particularity the misconduct complained of, the claim, if any, for damages occasioned thereby, and such evidence as to the amount of damages as may be available to the moving party. A reasonable counsel fee, necessitated by the contempt proceeding, may be included as an item of damage. Where the alleged contemnor has appeared in the action by an attorney, the notice of motion or order to show cause and the papers upon which it is based may be served upon his attorney; otherwise service shall be made personally, in the manner provided for by the Rules of Civil Procedure for the service of a summons. If an order to show cause is sought, such order may upon necessity shown therefor, embody a direction to the United States marshal to arrest the alleged contemnor and hold him in bail in an amount fixed by the order, conditioned for his appearance at the hearing, and further conditioned that the alleged contemnor will hold himself thereafter amenable to all orders of the court for his surrender.

(b) If the alleged contemnor puts in issue his alleged misconduct or the damages thereby occasioned, he shall upon demand therefor, be entitled to have oral evidence taken thereon, either before the court or before a master appointed by the court. When by law such alleged contemnor is entitled to a trial by jury, he shall make written demand therefor on or before the return day or adjourned day of the application; otherwise he will be deemed to have waived a trial by jury.

(c) In the event the alleged contemnor is found to be in contempt of court, an order shall be made and entered (1) reciting or referring to the verdict or findings of fact upon which the adjudication is based; (2) setting forth the amount of the damages to which the complainant is entitled; (3) fixing the fine, if any, imposed by the court, which fine shall include the damages found, and naming the person to whom such fine shall be payable; . . .

produce the documents in question (1110–1111). Hence, Galella had actual notice of the subpoena and waived any objections he might have had. Even in the absence of waiver of defect in service, actual notice suffices. Winn & Lovett Grocery Co. v. N.L.R.B., 213 F.2d 785, 786 (5th Cir.1954).

We find plaintiff knowingly, intentionally and wilfully avoided compliance therewith. Fed.R.Civ.P. 45(f).

## C. · The December 2, 1971 temporary restraining order

On December 2, 1971, after hearing both plaintiff and defendant, we entered a second temporary restraining order recited above. That order, too, remains in full force and effect on consent of the parties pending the final resolution of the application contained therein.

Galella's behavior on December 18, 1971 and January 9, 1972 which we have already delineated, clearly demonstrate his violation of the order with respect to the surveillance and distance provisions of the order. This is true whether it was Galella or Nancy Collins acting as his agent who actually took the pictures at El Morocco. Moreover, Galella admitted the violation was deliberate. (3477–3480, 3506)

## V

## MR. JULIEN

It is with regret that, after considerable reflection,[57] we are constrained to take Mr. Julien, plaintiff's trial counsel, to task for what we believe was unprofessional conduct throughout the trial, persisted in even after warnings that he desist.[58] It cannot go unnoticed.

1. Mr. Julien made a misrepresentation to a judge of this court. Plaintiff's counsel obtained *ex parte* an order from another judge of this court staying plaintiff's deposition before trial. In making application therefor plaintiff's counsel not alone failed to notify his adversaries of the intention so to move, but stated in the moving affidavit that no prior application for the relief sought had theretofore been made, whereas in truth, plaintiff's counsel had made a similar application before us which was denied shortly before.[59] At trial we afforded Mr. Julien full opportunity to explain; he stated in open court he would do so. (1295–1297) No explanation, not even a reference, was ever forthcoming.

2. Although he expressed himself fully aware of the only procedure recognized by law to recuse a judge—in this instance, a nominee of President Kennedy[60] (the procedure and the facts had been the subject of discussion nearly four weeks before trial[61]), Mr. Julien never brought on such an application; never did he file the affidavit and never did he sign and submit, as the law makes imperative, a certificate of good faith attesting to the *bona fides* of an application to recuse. Yet, commencing with the second trial day (292) and repeatedly throughout the trial, he angrily denounced us claiming we were biased.[62] Not once did he assign a valid basis therefor.[63] In these instances he played

---

57. We have not actually held an attorney in contempt in thirty-three years of judicial experience.

58. 1176, 2458, 2571, 2573, 2982, 4691.

59. 1183–1185; proceedings before us February 8, 1972 p. 44.

60. On the merits, the assigned ground would seem insubstantial.

61. January 19, 1972 with all counsel present in an off-the-record conference in the robing room.

62. 292, 457, 681–682a, 691, 1176, 1749, 1915, 2455–2458.

63. Mr. Julien moved to amend his pleadings. Before we ruled on the motion, he warned: "If you deny that amendment of pleadings, I insist, again, . . . that you should not be continuing with this case, that it is wrong for you to continue with this case . . . " (459) On another occasion when we simply stated we would consider defense counsel's motion to hold plaintiff in contempt of court: "Mr. Julien: I move that your Honor declare a mistrial and disqualify yourself from proceeding with this case." (691)

to the press and tried to contain the judge.

3. While he apologized the next day for accusing us in open Court of unprofessional conduct (followed immediately by another motion to disqualify us), he had so lost control that he confessed he was unaware he had made such a charge.[64]

4. Mr. Julien failed to comply with professional standards in his relations with counsel. He falsely accused them frequently of unprofessional conduct.[65] On one occasion he so aroused Judge Rifkind that, it seemed to us, he might have experienced a heart attack while heatedly responding.[66] He was unfair, degrading and discourteous towards them.

5. Mr. Julien evidenced disrespect of the Court, obstructed the trial by repeatedly disregarding its rulings, persistently interrupted and frequently resorted to sarcastic remarks to Court and counsel.[67] He roared, mocked and facially expressed his disdain and derision for the other side and its counsel and spewed his temper—indeed, "full of sound and fury, signifying nothing." When we found ourselves duty-bound to rule against him, his utterances were accompanied by simulated grief.

6. Mr. Julien engaged in obstructive tactics. He consistently reargued objections following rulings by the Court and repeatedly ignored our orders to desist.[68]

7. Mr. Julien repeatedly sought to mislead the Court and witnesses. He failed to observe his responsibility not to use false evidence or allude to any matter that will not be supported by admissible evidence. Frequently he misquoted and inaccurately summarized prior testimony and used misleading photographic evidence.[69]

8. Mr. Julien repeatedly sought to elicit privileged communications in violation of statute.[70]

9. Mr. Julien made improper extrajudicial statements concerning the case.[71]

Power resides in the court to hold Mr. Julien in civil contempt. We prefer an approach which will be neither civil nor criminal in nature, for we are primarily concerned that he be put to a renewed test of his fitness as a member of an honorable profession. Accordingly, we shall refer this matter to the bar association (which will take a fresh look at it) for such disposition as it deems meet and proper in the premises.

## VI

## DECISION

This opinion together with our supplemental findings of fact, constitutes our findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). The testimony of defendant and the witnesses called in her behalf, and the testimony of the Agents, is accepted.

64. Mr. Julien said ". . . As a matter of fact, it is so that I really didn't realize I said it until I saw something about it in the press this morning." . . . (1331, 1174–76)

65. 117, 129, 133, 81; 188–189, 324, 389–390; 2280, 3356. Particularly his attack made on Mr. London the last trial day: 680–683, 3488, 4685–4691. We mention, too, the occasion when, pointing to Mr. London, Mr. Julien said: "This is the one I can't stand." (324)

66. 1937.

67. 103, 1008, 1237, 1588, 2860, 4500; 2750–2773; 191–192, 530–531, 1046, 1909–1912, 2731–2733; 1750–1752; 196, 198, 212–213, 632, 1196–1199; 2382–2383, 2401,

3407, 4326–4327; 1681–1682, 2521, 2954–2955, 4189–4190, 4501. We suppose nothing can be done about his incessant screaming—a bad habit which we found wearing, wearying and grating.

68. 1580–1581; 2778–2779; 3044–3045; 2793–2795; 1280–1284, 1292–1293; 1299–1300.

69. 3141, 3143; 1556, 1709–1710; 145, 226–227, 1041–1042, 2690; 263–265, 266–268; 1199, 1204–1206; 2824–2825.

70. 2534, 2545, 2981–2982.

71. On or about March 1, 1972 he appeared in a televised interview in which he said in substance that he was only laying a foundation for an appeal during the balance of the trial.

1. The motions addressed to the dismissal of the complaint are granted. The complaint is dismissed.

2. The motions seeking a dismissal of the Government's complaint are denied. The application for a permanent injunction is granted.

3. The motions for a dismissal of the counterclaim are denied. The application for a permanent injunction is granted.

4. The permanent injunctions referred to in 2 and 3 immediately above shall enjoin plaintiff, his agents, servants, employees and all persons in active concert and participation with him from, *inter alia*, approaching within 100 yards of the home of defendant and her children, 100 yards of the schools attended by the children; at all other places and times 75 yards from the children and 50 yards from defendant; from performing surveillance of defendant or her children; from commercially appropriating defendant's photograph for advertising or trade purposes without defendant's consent; from communicating or attempting to communicate with defendant or her children.

5. Plaintiff is held in civil contempt for willfully and knowingly harassing defendant and her children in violation of the provisions of our temporary restraining order dated October 8, 1971.

6. Plaintiff is held in civil contempt for willfully and knowingly violating the provisions relating to surveillance and distance set out in our temporary restraining order of December 2, 1971.

7. Plaintiff is held in civil contempt for willfully and knowingly failing to produce photographic matter called for in the deposition subpoena.

8. For each of plaintiff's acts of civil contempt, the Court imposes a fine to be paid by plaintiff. Decision is reserved as to the amount of the fine until proof has been adduced, pursuant to Rule 14 of the Civil Rules, as to compensatory damages including counsel fees, at a hearing [72] to commence on a date hereafter to be fixed.

9. Costs are taxed to plaintiff.

10. The Clerk of Court is directed to send a copy of this opinion on July 23, 1972 to The Association of the Bar of the City of New York.

Settle orders on three days notice returnable July 17, 1972, 10:00 a.m., Room 2904.

---

72. Plaintiff has not demanded a hearing; nor does his reply, a general denial, suffice to put his misconduct in issue.